FERRITER AND OTHERS *v.* TYLER AND OTHERS.

[IN CHANCERY.]

*School District. Authority of Prudential Committee to Exclude Children from School.*

The prudential committee of a school district may exclude children from further attendance upon a term of school, for absence contrary to the rules thereof, though such absence be pursuant to command of their Roman Catholic parents, and by direction of their priest, for the purpose of attending religious services on *Corpus Christi* day.

APPEAL from the Court of Chancery. The bill alleged,

That all the schools within the limits of the village of Brattleboro are in school district No. 2 of the town of Brattleboro, and that James M. Tyler, S. M. Waite, and R. W. Clarke, are the prudential committee of said district; that your orators are inhabitants of said Brattleboro, and tax-payers in the district aforesaid, and each and all have children which they have been accustomed to send to the schools in said district for the purpose of educating them; that their children did attend the schools in said district until the 4th of June, 1874, and observed and obeyed all the rules and regulations of said schools; that on said 4th day of June, said children attended religious services at the Roman Catholic church in said Brattleboro, as directed by your orators to do, who are members of said church; that said 4th day of June is considered, regarded, and set apart as a holy day by said church and denomination; that it has been the custom and immemorial usage of all good and devout Catholics to attend divine services on the day aforesaid; that they were directed by their spiritual adviser, the priest of said church, to attend religious services on the day aforesaid, and have their children do so; that Father Lane, the priest of the Roman Catholic church in said Brattleboro, acting in behalf of the orators, sent a request to said prudential committee, asking that the children of the orators might be excused from attending school upon "holy days," and upon the 4th day of June aforesaid, for the purpose of attending religious services, and that said committee, through James M. Tyler, chairman thereof, disregarded and wholly refused to grant said request; that, acting in good faith, and believing in their constitutional right to worship God according to the dictates of their own consciences, without being abridged in the enjoyment of their civil rights, and believing that they could exercise parental authority and government over their children as regards their moral training and culture, the orators did direct and command their children to attend religious services on holy *Corpus Christi* day, the 4th of June aforesaid, and that the children of the orators, in obedience to said directions and command, did attend divine worship on the said 4th day of June, while the schools in said district were in session; that at the close of said religious services, the children of the orators quietly and in good order sought the various schools in said district where they were accustomed to go, and were expelled and prohibited from attending any of the schools in said district by said district and the said Tyler, Waite, and Clarke, prudential committee aforesaid; that on the 5th day

of said June, the children of the orators again repaired to the various schools where they were accustomed to go, by the direction of their parents, and were again expelled and prohibited from attending any of the schools in said district by the said district and the said Tyler, Waite, and Clarke, prudential committee aforesaid; that said children, and other children reared in the Roman Catholic faith, to the number of one hundred and fifty, are now prohibited by said district, Tyler, Waite, and Clarke, from attending any public school in the village of Brattleboro, and that the orators are wholly deprived of their right to educate their children in the public schools by said district, and said Tyler, Waite, and Clarke, prudential committee as aforesaid, for the causes above set forth, and none other whatsoever; that the orators have repeatedly requested said Tyler, Waite, and Clarke, committee as aforesaid, by themselves, their priest, the said Father Lane, and their solicitors, to allow said children to return to and attend the schools in said district, but that they absolutely refuse to comply with such request; that the defendants were bound in equity, and the said Tyler, Waite, and Clarke by virtue of their office as prudential committee of said district, to allow the orators the benefits, privileges, and advantages of the public schools for educating their children.

*Prayer*, that said district and the other defendants, be restrained by injunction from further prohibiting, interfering, or preventing, either by themselves, their agents or employes, the orators from sending their children to the public schools in said district, or from taking any means or measures that may interfere with the right of the orators to educate their children in the public schools in said Brattleboro; and for general relief.

The defendants Tyler, Waite, and Clarke, answered as follows:

They admit that they are the prudential committee of school district No. 2 in said Brattleboro, which includes the village of said Brattleboro; that the complainants are inhabitants of and tax-payers in said district, and that they each and all have children who have been accustomed to attend the public schools in said district, and that they did so attend up to the 4th day of June, instant, and yielded reasonable obedience to the rules and regulations of said schools; and, upon information, these defend ants admit that said complainants are members of the Roman Catholic church in said Brattleboro. And these defendants further answering say, that for thirty years the public schools in said districts have been graded, and consisted on the 4th day of June, instant, of seven primary, one grammar, and one high school; that

said schools are maintained at very great expense; that during the year ending March 31, 1874, there were 609 scholars in attendance upon said schools, which were maintained at an expense of $10,244, being an expense of more than $16 per scholar, and that the yearly expense of maintaining said schools for several years previous, had varied but little from the above-mentioned sum; that up to said 4th day of June, there were about 150 Catholic children in attendance upon said schools, and scattered through all the grades and classes thereof; that said schools being graded in classes from the primer classes in the primary schools to the classes in the highest branches usually taught in high schools, in order to secure the best improvement of the scholars therein in learning, it is very important that all the scholars in said schools should be constant and regular in their attendance, so that all the members of a class, when being instructed upon a given subject or topic, may be instructed together, and advance together from one subject to another; that by scholars being occasionally absent from their classes, their own improvement and the improvement of those who are present is greatly hindered; that the constant and regular attendance of said Catholic children is especially important, for the reason that they receive less aid and encouragement in learning at their homes than do the children of Protestant parents; that for more than ten years the prudential committee of said district have required, as a rule requisite for the regulation of said schools and the improvement of the scholars therein in learning, that when scholars have been enrolled upon the registers of the several schools, to attend such schools for a given term, they should be constant and regular in their attendance, and have not permitted them to be absent from the schools except by the permission of their teachers or said committee, on reasonable cause shown; and for the enforcement of this rule, and to secure such regular attendance, the committee have claimed the legal right and authority to suspend from school during the remainder of the then current term, scholars who violated said rule, and have, whenever in their discretion and judgment it was necessary, exercised such authority; but such authority never has been exercised arbitrarily, but always for the good of said schools; and when scholars have been thus suspended, they have been immediately readmitted to said schools upon a reasonable assurance to said defendants that the offence would not be repeated. These defendants have believed, and still do believe, that when parents and guardians cause their children and wards to be enrolled to attend a public school for a given term, they thereby submit them to the rules of the school during all its regular sessions, and sur-

render so much of their parental authority over them during such sessions, as may be necessary to secure the best interests of such schools, and the advancement of the scholars therein in learning; and that they may not retain them at home, or send them to school to suit the mere caprice, pleasure, or convenience of themselves or their children. If such rule were not enforced, in a large village like this, composed of people of all classes and degrees of intelligence, the public schools would be so much interrupted as to be of little value. On the contrary, the enforcement of this rule has nearly removed the evils of absences and tardinesses from said schools, and rendered them very useful in advancing children of all classes and denominations, in learning, and the parents and guardians of the scholars in said district, including the complainants, have ever cheerfully acquiesced in said rule, and approved of the same, and sustained these defendants in its enforcement, until said 4th day of June. And these defendants further say, that on the 3d day of said June, the Catholic children in the different schools informed their teachers that they should not attend school on the next day; that it was a holy day, as some of them said, and as others said, a holiday, and that they had been directed by their priest that they were to attend service at their church on that day; and that their teachers replied to them that they could not be excused for that purpose. And these defendants deny that either said priest or the parents of said children, or the children themselves, asked permission of either said teachers or of said committee, to be absent from school on said 4th day of June, except as follows: One of said teachers, on said 3d of June, notified these defendants that her Catholic scholars proposed to be absent from school on the next day, to attend church, to whom these defendants replied, that if such scholars were thus absent, it would be without permission, and contrary to the rules of the schools. On the morning of the 4th of said June, some five or six of said scholars called on said committee, and said to them they had heard that the committee would not excuse them if they were absent to attend church on that day, to whom the committee replied that they had not been requested to excuse them, and that they could not have done so had they been requested; that said children then went to their priest, and soon returned with a note from him in substance as follows:

J. M. TYLER, ESQ.,

SIR:—

You will confer a favor on us Catholics, by exempting the Catholic children from attending school

on all holy days.  I should have called and explained our reasons, but have not had opportunity as yet.

Respectfully Yours,

June 4th.                                                    HENRY LANE.

This note was received by these defendants at about ten minutes before nine o'clock, and the usual time for said schools to commence was at nine o'clock.  Said Tyler, as chairman of said committee, immediately answered said note as follows :

REV. HENRY LANE,
DEAR SIR:—

Your note is just received. To comply with your request, involves closing two of our schools, and greatly interrupting several others.  This we never have done, and cannot do.  We have great pride in our schools, in which the Catholic children are as well treated as any.

Very Respectfully Yours,

J. M. TYLER.

That said Lane received said note, as he subsequently admitted to these defendants, and yet about sixty Catholic children were on that day kept from said schools, for the purpose, as these defendants are informed, of attending some kind of service at their church, but whether by the direction of their parents or not, these defendants are not informed and cannot answer, but upon belief they say it was by direction of said priest.  And these defendants admit that in the afternoon of said 4th day of June, a few of said children who thus attended church applied for admission to their respective schools, and that all or nearly all of them applied for admission on the morning of June 5th, when they were told by said committee, and by their teachers by the direction of said committee, that as they had absented themselves from said schools without permission and in violation of the rules of the schools, which they well understood, they could not return without an assurance from their parents or their priest that they would in future comply with the rules of said schools.  And these defendants assured said children and many of their parents, and also said priest, both orally and in writing, that if said schools would not again be interrupted in like manner, these defendants would gladly admit said children to said schools, and that such assurances were made repeatedly by these defendants before this suit was brought.  And these defendants aver, that until said 4th day of June, the best understanding and relations had existed between said Catholic parents and children on the one side, and these defendants on the other ; and that these defendants bear towards said children nothing but the utmost good will, and now greatly desire that they may comply with the rules of said schools, and be

57

readmitted thereto, and have all the benefits thereof, as they have had heretofore. But said priest and said parents refused to comply with such reasonable request, but claimed that on all days which they regard as holy, they may, as a matter of right, take their children from said schools, without any regard to the rules thereof, or to the injury they thereby do to them. And these defendants have no knowledge or information except what is averred in said bill of complaint, that said 4th day of June was regarded by Catholics as a holy day, or that they were bound in conscience or by the rules ot their church, to attend religious service on that day, and cannot answer as to their belief or otherwise. But these defendants do of their own knowledge know that the laboring Catholic men and women in said village were generally at their accustomed places of business and labor during the day, and labored as on other days, and that many of their children were at play in the streets and elsewhere during that day. And these defendants further aver, that never before said 4th day of June, have the Catholic children in said schools been taken therefrom to attend any religious service at their church, nor has any claim of right to do so ever been asserted by their parents or their priest. It is true that some four years ago, Father Halpin, then the pastor of said Catholics, did request of said committee the privilege of taking all the Catholic children from said schools, to attend some kind of service at their church on a certain day, which was denied him, and upon its being explained to him how seriously the granting of such request would injure said schools, he withdrew his request, and always held services at his church at hours that would not conflict with the sessions of said schools. And these defendants deny that any of said complainants or their solicitor, since said 4th day of June, have requested of these defendants to permit their children to return to said schools, except under a claim of right to take them therefrom again whenever their priest requires them to attend church on days that they regard as holy. These defendants admit that they did not accede to such request, and have not permitted said children to return to said schools. These defendants are informed by said complainants and by said priest, that there are some eight to ten of said holy days in each year, six or seven of which usually occur when said schools are in session. No such days are known to or authorized by the laws of this state, and from long experience in the management of said schools as prudential committee, these defendants believe that the Catholic children therein cannot thus be withdrawn from the public schools as proposed by their parents and their priest, without great detriment to themselves in learn-

ing, and without great injury to the schools to which they respectively belong. And these defendants deny any intention or desire to interfere with the religious faith or practices of said Catholics or their children, or that they have ever thus interfered ; but they do believe that all religious services at said church might be held at hours that would not interfere with the schools at all, as they always had been held heretofore. And these defendants further say, that on the 5th day of said June, some three or four Catholic parents, whose children were thus absent from school the day before, though none of these complainants, told these defendants that their children should thereafter comply with said rule, whereupon these defendants immediately permitted said children to return to their schools, and upon like assurance, would gladly have permitted all to return ; but in a few days the children thus returned, with some thirty other Catholic children who were not absent from their schools on said 4th day of June, and who were in no way prevented from attending school either by their teachers or by these defendants, were, as these defendants are informed and believe, by direction of said priest, withdrawn from their schools, and have not attended since. And these defendants aver that they have always enforced said rule as to Catholic and Protestant children alike, and, as they believe, by virtue of the laws of this state ; and that certainly, in this instance, they have acted solely for the protection and improvement of said schools. And they further aver, that the summer term of said schools closed on the 26th day of said June, and that under said rule, said children, at the beginning of the fall term in September next, will have a right to return to said schools, without any hindrance from these defendants.

The district answered, adopting the foregoing answer. Hearing on bill and answer, September Term, 1874, BARRETT, Chancellor, and bill dismissed, *pro forma*, without hearing. Appeal by orators.

*E. W. Stoddard* and *G. W. Davenport,* for orators.

It is a well-settled principle of law, that parents are bound to maintain and educate their children during their infancy, and because of this duty, the law gives the parent the custody of and authority over the child. The first of these principles is derived from the law of nature, and is the true foundation of the second, viz : parental authority. The parents have not parted with this

legal right *expressly*, for in their sworn bill they say, that by their express direction and command their children attended religious services on said 4th day of June. Nor have they parted with this authority *impliedly*, for the case shows that on the morning of the 4th of June, the children were at home in the care and under the full control of their parents, and that they went from their homes to worship at said church. In *Morrow* v. *Wood*, a case recently decided by the Supreme Court of Iowa, this question of parental authority is fully discussed, and the court say that a teacher, with the consent of the committee, had no authority to compel a scholar to pursue a certain study contrary to the express direction of his parent. Am. Law Reg. November, 1874, 692.

The statute provides that the prudential committee may "adopt all requisite measures for the inspection, examination and regulation of the school, and for the improvement of the scholars in learning." Gen. Sts. c. 154, s. 39. This applies to such regulations as are necessary for the discipline and government of the school, and does not give the committee jurisdiction of the scholar outside of school, nor exclusive jurisdiction in school, against the express and asserted authority of the parent. The courts have always treated this question of parental authority with great care, as is apparent from all precedents. There can be no question but that the children of the orators were rightfully at church. It has been decided in Pennsylvania, that it is the right and duty of a parent to look after the moral education of his child, and that he has a right to educate the child in his own religious faith. It has been decided in this state that constitutional rights cannot be impaired. *Plimpton* v. *Somerset*, 33 Vt. 283; *State* v. *Peterson*, 41 Vt. 504.

We further claim, that a court of equity has jurisdiction of the orators' children, and can interpose to protect them. When a cause is in court, other circumstances than those which affect the orators can be considered. Kent Com. (11th ed.) 194, 195, 218, and cases cited.

It is intimated that the parents of the children are not the proper parties to bring this bill. The defendants have never made any claim of this character, and ought not to be allowed to

do so now. We claim that the orators have such an interest as to warrant making them parties in a court of equity. Under the laws of this state, the children are liable to be arrested because they are growing up in ignorance, and the orators are liable to a prosecution and fine because their children do not attend school. Laws of 1870, pp. 48, 49. This alone would justify the orators in bringing the bill in a court of equity.

Besides, the orators are entitled to the earnings of their children during their minority, and the conduct of the committee has put the children back a year in their education, and has not only compelled the orators to incur the expense of educating their children for an additional year, but also deprived them of one year's service of them. The exclusion of the children from school by the committee, was an entire joint injury and damage to the orators. It has been long settled, that if the damage be joint, or the consideration of a contract be joint, a joint action may be maintained. *Coryton* v. *Litheby*, 2 Wms. Saund. 112, and cases there cited.

*J. M. Tyler* and *R. W. Clarke,* for defendants.·

While it is the duty of districts to maintain schools, the immediate management of them is delegated to the committee whom they are required by law to elect. It would be no more idle for the parents in a district to interfere with the duties of the collector, clerk, and treasurer, by taking a hand in collecting the taxes, keeping the records, or disbursing the funds, than, having duly elected a committee, to attempt to manage the schools. This would be so entirely impracticable that the law will not entrust the duty in the hands of the parents generally, but compels them to create a committee for this very purpose. And so this court has held that the committee are the official agents of the district. *Edson* v. *Sprout*, 33 Vt. 77 ; that they have the general care and control of the school property of the district while schools are in operation ; *Chaplin* v. *Hill*, 24 Vt. 528 ; and that they have the power to employ and dismiss teachers ; *Mason* v. *School District*, 20 Vt. 487. The division of the school year into convenient terms, the assignment of scholars to the different grades, their

examination and promotion from one grade to another, the courses of study to be pursued, and the rules and regulations for the government of the schools, are matters that must be committed to some official of the district, and the law commits them to the committee. *School District* v. *Loud*, 12 Gray, 61. The power that the committee have to make regulations for the schools, is delegated to them by the voters and parents of the district, under the laws of the state. The rules of a school committee, if made within statutory limits, are the rules of the people of the district.

If it is claimed that the rule adopted in this case is subversive of parental authority, the obvious answer is, that parents must surrender so much of their parental authority over their children during the session of the schools, as is necessary for the good of the schools. To assert that parents have authority to make rules and regulations superior to those of the committee, is to deny the validity of the statute.

We insist that parents have no *absolute* right to send their children to the public schools ; that the right is *conditional*, upon their compliance with the rules and regulations of the schools. *Guernsey* v. *Pitkin*, 32 Vt. 224 ; *Spiller* v. *Woburn*, 12 Allen, 127 ; *Donahue* v. *Richards*, 38 Maine, 379 ; *Sherman* v. *Charlestown*, 8 Cush., 160 ; *Lander* v. *Seaver*, 32 Vt. 114 ; *Spear* v. *Cummings*, 23 Pick. 224 ; *Hodgkins* v. *Rockport*, 105 Mass. 475 ; *Stevenson* v. *Hall*, 14 Barb. 222 ; *Burdick* v. *Babcock*, 31 Iowa, 562 ; *Scott* v. *School District*, 46 Vt. 452 ; *Williams* v. *School District*, 33 Vt. 271. The compulsory law of 1872 sets at nought the doctrine of the absolute control of parents over their children when their education is required.

It is claimed that the enforcement of this rule is an abridgment of the constitutional right of the children of the orators to worship God according to the dictates of their consciences. If the case stood upon the facts set forth in the bill upon this branch of the case, unanswered by the defendants, the orators would not be entitled to an injunction. The answer denies all equities of the orators in this respect, by showing that in all previous years such service had been held out of school hours, and that on this day the Catholic people of the district were at their usual work, ex-

cept during the hour of service. Had an injunction been granted upon the bill before answer filed, upon the answer coming in and denying all the equities, the injunction on motion must have been dissolved. Blake's Chancery, 404. The rule was not made and enforced to interfere with the religious faith or worship of any denomination. It does not prohibit Catholics from celebrating this festival or attending service on that day. It is a general rule regulating attendance, applicable to all scholars alike, and designed for the good of all.

There is no ground for the intervention of an injunction in this case, for the answer shows that the children were excluded only for the remnant of the then current term; that no request was made that they might return, except when accompanied with the demand that they should be excused whenever the rules of their church required their attendance upon religious service, which the defendants, in good faith, believed could not be granted without too great injury to the schools; that the defendants proposed to them and their parents and their priest that they might immediately return to school upon an assurance that the schools should not be broken up again in like manner. Therefore said scholars remained out of school the remainder of that term by their own fault, and not through the fault of the committee.

We deny that the orators have such a joint interest in the subject-matter of this suit as entitles them to join in this bill. We also deny the right of any parent to sue in his own name, either at law or in equity; such suit should be in the name of the child, by his next friend.

This cause was continued by the Supreme Court, February Term, 1875, into the next General Term, October, 1875, when it was argued, and held for advisement till the February Term, 1876, of Windham County Supreme Court, when the opinion of the court was delivered by

Barrett, J. It seems expedient to settle in the outset the scope and limits of the case that is before us. The case is made by the bill and answer. Such facts alleged in the bill as are admitted, or are not denied by the answer, are to be taken as established. Such

facts stated in the answer as are pertinent to the subject-matter and grounds of the relief sought by the bill, are to be taken as established. It thus is shown that the orators are members of the Catholic church in the village of Brattleboro, that Father Lane, the priest of said church, acting in behalf of the orators, on the morning of June 4th, 1874, sent to the defendants, who were the prudential committee of the school district in that village, this note:

"You will confer a favor on us Catholics by exempting the Catholic children from attending school on all holy days. I should have called and explained our reasons, but have not had opportunity as yet."

It was received by the committee about ten minutes before the time of commencing the forenoon session of the schools on that day. The committee immediately replied by written note: .

"Your note is just received. To comply with your request, involves closing two of our schools, and greatly interrupting several others. This we never have done and cannot do. We have great pride in our schools, in which the Catholic children are treated as well as any."

The bill states that the 4th day of June is considered, regarded, and set apart as a holy day by said church and denomination; that it has been the custom and immemorial usage of all good and devout Catholics to attend divine service on that day; that they were directed by their spiritual adviser, the priest of said church, to attend religious services on that day, and have their children do so.

It is stated in the answer that the defendants had no knowledge or information, except from the bill, that said 4th of June was regarded by Catholics as a holy day, or that they were bound in conscience, or by the rules of their church, to attend religious services on that day. It appears by the answer that on the day before, the Catholic children in the different schools informed their teachers that they should not attend school on the next day, that it was a holy day, as some of them said, and as others said, a holiday, and that they had been directed by their priest that they were to attend services at their church on that day, the teachers replying that they could not be excused for that purpose; that one of said teachers informed the committee on that day of the proposal of her Catholic scholars to be absent to attend

church the next day; that on the morning of said 4th of June, five or six of such scholars called on the committee and said they had heard that the committee would not excuse them if they were absent to attend church on that day, to whom the committee replied that they had not been requested to excuse them, and that they could not have done so if they had been requested ; that said children went to their priest and soon returned with the note from him above recited.

The foregoing constitutes all that passed by way of application or request to the committee and teachers for permission to be absent from school on said 4th of June.    And there was nothing more . tending to show that the priest sent said note by the request of the orators, or that the committee knew he was acting by their request in sending it.    Some sixty Catholic children, by direction and command of their parents, were kept from school to attend religious services on said 4th of June, being, as stated in the bill, " holy *Corpus Christi* day."    A few of them applied for admission to the schools in the afternoon of that day, and all, or nearly all, so applied the next morning, when they were told by the committee that, as they had absented themselves without permission, and in violation of the rules of the school, which they well understood, they could not return without an assurance from their parents or their priest that in future they would comply with the rules of the schools, the committee assuring said children and many of their parents and also the priest, that if said schools would not again be interrupted in like manner, they would gladly admit said children to them ; that said priest and parents refused to comply with such proposal, and claimed that on all days which they regard as holy, they may, as matter of right, take their children from the schools, without any regard to the rules thereof, or to the injury they thereby do to them ; that there are eight or ten of such holy days in each year, six or seven of which usually occur when said schools are in session ; that never before the present instance have the Catholic children been taken from the schools to attend any religious service at their church, nor had any claim of right to so take them been asserted by their parents or the priest; that the laboring Catholic men and women in the village were gener-

58

ally at their accustomed places of business and labor during the day, and labored as on other days, and many of their children were at play in the streets and elsewhere during that day ; that some four years before, the priest, Father Halpin, asked of the committee the privilege of taking all the Catholic children from said schools to attend some service at their church on a certain day, which was denied him, and on its being explained to him how injurious to the schools the granting of the request would be, he withdrew the request, and always held services at his church at hours that would not conflict with the sessions of the schools ; that up to said 4th of June, about 150 Catholic children were attending said schools, distributed through all grades and classes thereof, the whole number of scholars being about 600 ; that for more than ten years the committee have required as a rule for the regulation of said schools and the improvement of the scholars in learning, that those registered as scholars for a given term, should be constant and regular in their attendance, and not be absent except by permission of the teachers or the committee on reasonable cause shown ; and for the enforcement of the rule, and to secure such regular attendance, the committee have claimed the legal right and authority to suspend from school during the remainder of the current term, scholars who violated said rule, and have exercised such authority whenever they have judged it necessary for the good of said schools.

The bill states that the orators, by themselves and their priest and their solicitors, had repeatedly requested the committee to allow said children to return to and attend said schools. The answer denies that they have so done, except under a claim of right to take said children from the schools whenever their priest requires them to attend church on days that they regard as holy. The bill states that the children of the orators and other children reared in the Roman Catholic faith, to the number in all of one hundred and fifty, are now (when the bill was made) prohibited from attending any public school in the district. The answer replies, that on the 5th day of June, three or four Catholic parents (not any of the orators) whose children had been absent the day before, told the committee that their children should thereafter

comply with said rule; whereupon said children were immediately permitted to return to the schools, and all would have been gladly permitted to return upon like assurance; but in a few days said children, with some other Catholic children who were not absent on said 4th of June, and in no way prevented from attending the schools, were, as the defendants were informed and believe, by direction of said priest, withdrawn from the schools, and had not since attended.

The ground and reason of the *exemption* asked for in this case, as stated in the bill, are, that the parents of said children were members of the Catholic Church, and that they were directed by the priest of said church to attend religious services on said 4th day of June, and have their children do so, as already more fully stated. The *legal* ground and reason of the relief prayed for, are indicated by the expressions in the bill, namely, " their (the orators') constitutional right to worship God according to the dictates of their own consciences, without being abridged in the enjoyment of their civil rights," and their " right to exercise parental authority and government over their children as regards their moral training and culture "—which, when put in the form of direct and explicit statement, is, in effect, that the enforcing of the rules of suspension by the committee upon the children of the orators, violated the rights of the orators under Art. III. of the constitution of the state, and violated also the legal right of the orators to control their children in the matter of attending the public schools of the district, as against the right of the committee in the same behalf.

It is the duty of this court to decide whether either of these propositions is maintainable. The article in the constitution on which the former of these depends, is, " That all men have a natural and inalienable right to worship Almighty God according to the dictates of their own consciences and understandings, as in their opinion shall be regulated by the word of God ; and that no man ought to, or of right can, be compelled to attend any religious worship, &c., contrary to the dictates of his conscience ; nor can any man be justly deprived or abridged of any civil right as a citizen on account of his religious sentiments or peculiar

mode of religious worship ; and no authority can or ought to be vested in or assumed by any power whatever that shall in any case interfere with, or in any manner control, the rights of conscience in the free exercise of religious worship ; nevertheless, every sect or denomination of Christians ought to observe the Sabbath, or Lord's day, and keep up some sort of religious worship which to them shall seem most agreeable to the revealed will of God." In the light of that article, the former of these propositions, if critically considered in its relation to the case made by the bill, obviously cannot be maintained ; for the action of the committee touches not nor affects the worship of Almighty God by the orators, whether such worship be one way or another, or not at all ; nor does it touch or affect their religious sentiments or peculiar mode of religious worship ; nor does it in any manner interfere with or control the rights of conscience in the free exercise of religious worship. That article in the constitution looks only to the personal conscience of the individual, as related to his personal worship of Almighty God. It looks only to the personal relation of the individual to his God, both as to belief and worship, and not to the relation that the individual may sustain to others in respect to their belief and worship. The not consenting. that the children of the orators might leave the schools for the purpose of attending divine worship on the day in question, did not touch the belief of the orators as to the character of that day, nor did it touch or control the free exercise by them of religious worship according to their belief and conscience, nor is anything to that effect alleged or intimated in the bill.

Still further, it may be remarked that the bill does not present it as a matter of conscience either with the orators or their children, that the children should attend service on that day; but only represents that it is a holy day in the church, and accustomed to be observed as such. No divine authority for it is quoted or asserted, and its observance, in this instance, by the orators and their children, by attending religious services, is put upon the direction of the priest, without showing or asserting that anything of religious conscience was involved in obeying or not obeying that direction. Yielding to supervening authority exercised by a

recognized superior is one thing, but it is not necessarily nor impliedly the same thing as obedience to the dictates of the inward monitor and avenger.

Again, when the facts set forth in the answer are considered, it seems very apparent that only the attendance of the orators' children on the morning session of the schools on that 4th of June, involved any matter of conscience in relation to the day; for many Catholics in the village were about their accustomed business and labor during that day as on other days, " and many of their children were at play in the streets and elswhere during that day," and some of the scholars that had been taken from the schools to attend the religious service, presented themselves for attendance in school in the afternoon.  Hence, as to the matter of fact as shown by the bill and answer, it would be very difficult to find that the observance of the day is binding on the Catholic conscience; and the bill and answer furnish the only legitimate evidence we have on that subject; and this difficulty is considerably enhanced by the fact that up to the 4th of June, 1874, that conscience had never caused it to be required that the Catholic children should be absent at all from the schools on that day.

It is proper also to state explicitly, that if the action of the committee, either in the making or the enforcing of the rule, was unlawful in this instance, and was the subject of remedy by suit in chancery or at law, such suit should not be in the name of the parents, but of the children, as the real party plaintiff.

What is thus presented seems to show sufficient ground and reason for holding that the bill cannot be maintained on the proposition as to the constitutional rights of the orators.  But having regard to the character of the subject, and to the. scope of the arguments that have been addressed so us, we are disposed to consider that proposition in a broader view.

To this end, suppose the children of the orators to be the orators, and to have set forth as true of themselves all that the bill contains as to the church, and the day, and their priest, and the application to and refusal by their teachers and the committee, and the attending on the religious services, and the being excluded from the schools, and the action of the committee in respect thereto,

and to have been answered in every material respect as the bill
of the orators is answered ; in such case, the ground of complaint
and remedy would be, that their (the children's) rights under
Art. III. had been violated by the action of the committee.  Could
it be maintained ?   This is really the question which counsel for
the orators seem to regard as being before the court. •

This brings into consideration the scope and purpose of that
article of the constitution.  It is noticeable as bearing on the
subject, that this is the first instance of the assertion of what is
now claimed for that article.   The article was in the original
constitution of 1777, and has been continued from that time to
the present.   In that original constitution, also, the 40th section
was, " A school or schools shall be established in each town by
the legislature, for the convenient instruction of youth," &c.   By
the revision of 1785 — ratified in 1786 — that article was changed
in phrase, but not in sense or effect, and thus it has remained,
being sec. 41 in our present constitution.  The Legislature, in pur-
suance of said provision of the constitution, has been continuously
making provision for such schools ; and such schools have existed
and been in operation in all the towns in the state down to the
present time, with great variety of detail as to organization, admin- .
istration, and requirement, even to compulsory attendance by force
of specific enactment.   While those two aticles have thus, side by
side, been in force to every practical intent, all forms of religious
belief and unbelief, characterizing the various sects and denomi-
nations of men relatively to religion, and all forms of church
organization based on such forms of belief, have been in existence
and operation, with all the details of religious worship and ser-
vice professedly involving the conscience and its demands peculiar
to each differing sect, and yet this is the first instance in which
it has been asserted that the administration of our common public ·
schools, under the cotemporary constitution in that behalf, and the
enacted laws, has violated any rights accorded by said Art. III.
It is to be noticed still further, that while those two articles have
been in force, and the successive Legislatures have been enacting
laws under which schools have been going on through the imme-
diate agency and action of committees and teachers vested with

the same official authority as those now in office, councils of cen-
sors, charged by the same constitution with the duty of noting
infractions of that instrument by the Legislature, and vested with
the function of initiating alterations of the constitution itself, have
been chosen and in official action every seven years, and yet no-
body has· suggested that the legislation under sec. 41, or the
action of committees and teachers under that legislation, or that
sec. 41 itself, has trenched on anybody's rights of conscience
under said Art. III.    This is stated, not as showing that the
action of the committee in this case did not violate such rights,
but as showing that the present claim for that article by these
orators is of novel impression, as we say of a proposition or
question of law when for the first time presented for judicial
consideration.

It now behooves that we should call to mind what, as matter of
history, was the occasion and what the purpose of that Art. III.
The history of the Puritans in England, and especially of those
who were known as the New England Pilgrims, shows the occa-
sion ; and in this regard it is in point to refer to the religious his-
tory of the continent of Europe for several centuries next prior
to the formation of our government.    The government of Eng-
land and the governments of the continent had no written, organic
constitutions defining the powers of the governing authority on
the one hand, and defining and guaranteeing the rights and priv-
ileges of the subject on the other.    The subject lived in subor-
dination to the law-making and law-executing power——he individ-
ually, or all the subjects collectively, not being recognized as hav-
ing rights and privileges, only as they should be accorded to them
by those powers.    The British idea of the British government
was sharply expressed in 1775, in the answer written by Dr.
Johnson to the resolutions and address of the American Congress
——"that the King and Parliament have the power of disposing,
*without the consent of the subjects, of their lives, liberties, and
properties.*"    (The italics are in the authentic print.)    Sove-
reignty was not derived from the subjects, but it supervened upon
them by " *divine right*," in the form and character of what was
called " *the government.*"    Church and state were indissolubly

connected, the church dogmatizing the faith, and the state enacting it into legal requirement, with disabilities and penalties. The disabilities on the score of religious faith and practice which subjects were made to experience—the penalties which confronted non-conformity in England—the horrors which hunted and avenged imputed heresy, at times, both in England and on the continent, had made those who were not of the religious faith required or approved by the governing powers, and who for that reason had gone forth to the desolations of the desert and the wilderness to escape the eye, and ear, and arm of such powers, feel and appreciate the importance, in creating governments for themselves, of seeing to it that such governments should not have the *right*, at least, to subjugate them to like disabilities, penalties, and horrors.

In the first constitution of the state of New York, drafted by John Jay, chairman of a committee of his peers in character, and some of them in ability and learning, and adopted on the 20th of April, 1777, with but one negative vote in the convention that framed and established it, Art. 38—corresponding to Art. III. in our constitution of the same year — shows in direct expression, the occasion and purpose of the article — an occasion and purpose common to the colonies then just enfranchised by the Declaration of Independence. I copy thus: "And whereas we are required by the benevolent principles of rational liberty, not only to expel civil tyranny, but also to guard against the spiritual oppression and intolerance wherewith the bigotry and ambition of weak and wicked priests and princes have scourged mankind, this convention doth further, in the name and by the authority of the good people of this state, ordain, determine, and declare, that the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever hereafter be allowed within this state to all mankind: *Provided*, that the liberty of conscience hereby granted shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of this state."

When our constitution was first framed and adopted, no occasion had been given for regarding the grievance that is now complained of; so, such grievance could not have been in mind as an

object specially to be provided against in the making of that Art. III.   On the other hand, the government-making people of New England, in the causes that had led to its first settlement by the Pilgrims, and by their children, and by after emigrants and *their* children, had ever deep and fresh in mind occasion and reason for the provisions of that article.   And nothing could more fully, pointedly, and specifically indicate the nature of such occasion and reason than the language of the article itself.   It was designed by it to secure to every subject equal civil rights, irrespective of his religious faith ; so that his being a Catholic or a Protestant— his being a Calvinist or an Arminian—his being an orthodox evangelical or a free-thinker—his being a Baptist or a Universalist—an Episcopalian or a Quaker, should not make him the object of discriminating legislation or judicial judgment to his disadvantage, as compared with those of different faith and practice,—so that no law should be aimed or executed against him because he professed and practiced one form of religious belief or disbelief rather than another, within the limits of personal immunity consistent with good order and the peace of society under the government.   It was designed to debar the law-making and law-administering powers from enacting or adjudging that unless the subject should profess a prescribed system of faith and become a member of a prescribed religious organization, and conform in his worship to the prescribed ritual, he should not be entitled to the same personal rights, privileges, and enjoyments under the government as those who should do so.   It was designed to secure absolute equality before the law of all subjects under the law, whatever might be their faith or notions in the matter of religion. And as a result, may not a Catholic be a Catholic as freely as a Protestant may be a Protestant, with no law aimed at him because he is a Catholic and not a Protestant?   It would seem to be trifling with a momentous subject, to claim that Art. III. was designed to prohibit the Legislature from enacting any law, the carrying into effect of which might interfere with the wishes, and tastes, and feelings of any of the citizens in the matter of religion, and even with the performance of religious rites that should be

59

regarded as matter of conscientious duty on the part of some of the subjects of the realm. Government, with reference to the ends designed to be secured and served by its existence and action, is altogether a practical matter—not speculative, fanciful, sentimental, or impracticable. It performs its functions, and works out its results, by the instrumentality of laws enacted and laws administered,— laws adapted to the subject-matter of them, and to the accomplishing of the ends designed, and operating equally and alike upon all who come within their scope.

One of the chief ends of the government is, to provide means and facilities for developing and educating and training the young into virtuous and intelligent men and women. This is recognized and emphasized by the section of the constitution already referred to as to schools, and which since 1786 has been in these words : " Laws for the encouragement of virtue and prevention of vice and immorality, ought to be constantly kept in force and duly executed, and a competent number of schools ought to be maintained in each town for the convenient instruction of youth." ·

As already suggested, the constitution proceeds upon the assumption that this can be done consistently with Art. III. In pursuance of that assumption, the Legislature, through the whole course of our existence as a state, has been active and earnest and considerate in the making of laws for the existence and support and management of what is meant by " schools in each town." In so doing it has never aimed to make, nor has it ever made, any provision that discriminates or distinguishes in its operation, between persons of different religious sects. All are subjected alike to the law and its administration. The Methodist, who regards his camp-meeting as demanding as much of his conscience as the Episcopalian does his Christmas or Lent ; the Episcopalian, who regards the feast and fast-days of his church as demanding as much of his conscience as the Catholic does his holy *Corpus Christi ;* the Congregationalist, and Presbyterian, and Baptist, and other sects, who care for none of these things, and whose prayer-meetings and protracted meetings demand as much of their consciences as in the case of the others before named, and

the man of no preference and no religion, *all*, and all their children, are subjected alike to the school laws, and to their administration.

Art. III. was not designed to subjugate the residue of the constitution, and the important institutions and appliances of the government provided by the enacted laws for serving the highest interests of the public as involved in personal condition and social relations, to the peculiar faith, personal judgment, individual will or wish of any one in respect to religion, however his conscience might demand or protest. In that respect it is implied that while the individual may hold the utmost of his religious faith, and all his ideas, notions, and preferences as to religious worship and practice, he holds them in reasonable subserviency to the equal rights of others, and to the paramount interests of the public as depending on, and to be served by, general laws and uniform administration. Rights of conscience and schools, under the constitution, were, when that instrument was made, and have been during all its continuance, to be harmonized with practicable consistency—the schools under section 41 not to be subordinated to the rights of conscience under Art. III., any more than the rights of conscience under Art. III. are to be subjected to the rights as to schools under section 41.

By the revision of 1786, that section 40 was incorporated into said section 41, immediately after the first clause, as is shown by section 41 of our present constitution, already recited. From all which it is plain that in those early times, *religion* and *learning*, under the constitution and the laws to be enacted, were deemed to be compatible, and that schools of all grades, from the " schools in each town " to the university, were to be the subjects of legislation under the constitution ; and it is especially plain that the " schools in each town;" as early as 1786, were combined with, if not given the precedence to, *religious* societies and bodies of men, as an instrumentality of the government, by means of laws, " for the encouragement of virtue and prevention of vice and immorality." In conclusion on this topic, as we cannot improve so we adopt the language of Judge POLAND, in *Williams* v. *School District in Newfane*, 33 Vt. 275 : " Without making fur-

ther reference to the almost numberless acts of the Legislature exhibiting the most active watchfulness and fostering care for the cause of popular education, enough has already been stated to show that the whole subject of the maintenance and support of our common schools has ever been regarded in this state as one, not only of public usefulness, but of public necessity, and one which the state in its sovereign character was bound to sustain."

We now proceed to remark, that it stands out so plain as not to be matter for debate, even if it be not expressly conceded, that schools, in order to realize the intent of the constitution in their behalf, must be subjected to system and order under established rules. Hence, the law charges the committee with the duty of " adopting all requisite measures for the inspection, examination, and regulation of the schools, and the improvement of the scholars in learning." Gen. Sts. c. 22, s. 39.

Let it be granted that parents and others may, upon their own respective reasons, control the attendance of the scholars, as against the official right of the committee in that behalf, and practically, the ground of system, and order and improvement, has no existence. For the parents and guardians of the scholars may, each on his own motion, and on his own notions, withhold their respective scholars from the schools. In this respect, so far as its effect on the schools is concerned, it makes no difference whether the occasion and motive involve conscience, will, whim, or the pocket. Now, when this matter of conscience, as against the requirements of the law, is brought to the test, the practical result of what is claimed by the orators in this case is shown to be so impracticable, not otherwise to characterize it, as to preclude further discussion. If a Catholic citizen should be serving on a jury in the midst of a trial, when divine service in his church on holy *Corpus Christi* should be in progress, would it be a violation of his rights under said Art. III. to compel him to keep his seat and serve through the trial ? The same may be asked of the Jew or the seventh-day Baptist, who should be required to do like service on Saturday. The same may be asked of a devout Methodist, when a camp-meeting or a love-feast should be in progress in his vicinage. If either or all should refuse to serve, would

their rights of conscience under Art. III. be a valid defence in a prosecution for the penalty in such case provided ? Suppose a Catholic sheriff should have in his hands some process that it became his *official* duty to serve during the time that divine service in his church on some holy day should be in progress, would his rights of conscience under Art. III. be a good plea in bar to an action for official default by reason of attending said service " for conscience sake," instead of making service of the process ? But enough of test and illustration.

Let it be repeated then, that that article in the constitution was not designed to exempt any person or persons of any sect, on the score of conscience as to matters of religion, from the operation and obligatory force of the general laws of the state authorized by other portions of the same instrument, and designed to serve the purposes contemplated by such other portions ; it was not designed to exempt any persons from the same subjection that others are under to the laws and their administration, on the score that such subjection at times would interfere with the performance of religious rites, and the observance of religious ordinances, which they would deem it their duty to perform and observe but for such subjection. While all stand on equal footing under the laws, both as to benefits and privileges proffered, and as to exactions made, and liabilities, and penalties imposed, no one's rights of conscience, as contemplated by said Art. III., are violated in a *legal* sense. And it is fitting here to remark, that this court have to deal with the subject as *jurists*, regarding the constitution and the laws, and what is done under them, with reference to principles and reasons that appertain to the subject in its legal elements, qualities, and aspects, and not as religionists, not as sectaries, not as those who regard something besides the government as of ultimate supremacy in the affairs of men on earth, but as those who regard the government created by the constitution, and the laws made under the authority and within the scope of the constitution, as the ultimate sovereignty in this state, and as equally obligatory and effectual upon all. It is not our *official* duty to discuss, nor our official prerogative to pronounce upon, the policy or propriety of the provisions and requirements of the constitution, or of

the laws enacted conformably to the constitution, in view of their
bearing upon the matter of personal religion and morals, or on
the matter of religious, moral, and secular education ; but it is
only our province to interpret and give application and effect to
the constitution and laws as they exist.   The court does not make
the law, either constitutional or statutory, but only administers it
in cases as they are presented for consideration and decision.
The part of the opinion in *Donahue* v. *Richards*, 38 Me. 379, and
the cases cited, which bear on this ground of the present case, are
worthy of attention by all who may be interested in the subject.

Pursuing no further the discussion of this ground and aspect of
the case, it is proper here to remark, that the note of the priest
to the committee did not state any ground for asking for the ex-
emption from attending school on the particular day in question,
nor was the application limited to that day, nor did it name that
day at all ; but it was an application for a dispensation, as matter
of *favor* on the part of the committee, from attendance " on all
holy days," with nothing indicating a *claim of right* made upon
the committee ; and so, no cause, reasonable or otherwise, was
presented, in view of which the committee could be put in a posi-
tion of official fault by not giving leave of absence on that day.
Then, as to the *condition*, on which only they would let the ab-
senting scholars return to their schools.   In that they asserted
their right to enforce the rule of exclusion for the residue. of the
term.   So far as rights of conscience under the constitution are
involved, they were not precluded of that right, that is, the Art.
III. does not render invalid the law under which the committee
claim authority to make and enforce that rule, nor the rule itself,
as we have already shown.

. It remains now to be considered whether the bill can be main-
tained on the other ground, namely, the prerogative of parents to
control their children as scholars, as against the prerogative of
the committee to make and enforce the rule in question.   This
does not involve any right or question of conscience under the
constitution, but only the matter of *legal* right under the statutes as
to public schools.   In this case it is not a question of discipline
or punishment of the scholar, as it was in *Lander* v. *Seaver*, 32

Vt. 144, or as it was involved in the case of *Morrow* v. *Wood* (Iowa), Law Register, Nov. 1874, p. 692. By our statutes the committee are charged with the duty of "adopting all requisite measures," &c., as before recited. The graded school in Brattleboro is organized and acts in pursuance of the statutes in that behalf. The committee are chosen and charged with their duties under the same statutes. They adopted rules for the regulation of the schools, and for the improvement of the scholars in learning. The rule in question is for the purpose of inducing and enforcing constancy in attendance. That such constancy is essential to such improvement, is not debatable. That such attendance is requisite as matter of regulation, in order to the necessary classification of the scholars in reference to age, capacity, studies, and proficiency, is not debatable. Those who attend constantly cannot be required to linger, in order that the inconstant may keep along with them : nor can such inconstant scholars keep equal pace with those who attend constantly. The rule, then, is such as is contemplated by the statute, so far as the *purpose* of it is concerned. That purpose is indispensable to the attainment of the object and end proposed by the statutes, both as to the individual scholar, and as to all others who may be affected by his attendance and absence. The answer states, as before recited, that the rule had been in operation for more than ten years. The children of the orators were subjected to its operation in the present instance. Was that unlawful ?

If the orators had the right to control the attendance of their children as against that rule, then the committee had not the right to maintain and enforce such rule. We are not prepared to sanction a view of the subject that would subordinate the authority of the committee in the matter of the attendance of registered scholars, to the will of parents. On the other hand, we do not hesitate to hold and declare as matter of law, that in this respect, the citizen is in subordination to the lawful rules for the regulation of schools and the improvement of scholars in learning ; and this is for the same fundamental reason that he is in subordination to the statutes themselves, on that or any other subject ; and it is no more his right to defy or disregard those rules, than it is to

defy and disregard any statute that affects him as a citizen in respect to schools, or any other subject involving the common weal, as it is to be provided for under the constitution by the legislation of the state. The occasion does not require a repetition of the trite maxims as to the surrender of natural rights as a condition of citizenship under the government, and is answered by the remark, that if the citizen, either on the score of conscience or of parental prerogative, or in any other respect, finds himself unduly curbed and restricted' in what he regards his personal rights, natural or otherwise, by the constitution and the constitutional laws of the state, there is available to him the beneficent declaration of Article XIX.

It suffices to recur to some of the leading cases that have been before the courts, some of them involving the prerogative of teachers and committees immediately over scholars where parents have not interposed ; some of them involving that prerogative in respect to scholars where, as in this case, parents have interposed. Of the former kind is *Guernsey v. Pitkin*, 32 Vt. 224, where, by the concurrence of committee and teacher, the plaintiff was virtually excluded from the school, because he would not comply with the requirement upon all scholars in grammar, to write compositions. In that case there was no prescribed penalty constituting a part of the rule of requirement, but the penalty was extemporized to meet the exigency. The prerogative of the committee and teacher, both as to requirement and penalty, was maintained. In *Landers v. Seaver*, 32 Vt. 114, the plaintiff, a boy some eleven years old, some hour and a half after the school had closed for the day, and when he was at home, and engaged in his father's service, used saucy and disrespectful language to the teacher, the defendant, in the presence of some of his fellow-pupils. For this the defendant whipped him on his going to school the next morning. The court held the following language : " But where the offence has a direct tendency to injure the school and bring the master's authority into contempt, as in this case, when done in the presence of other scholars and of the master, and with the design to insult him, we think he has a right to punish the scholar if he comes again to school." Such was the judgment of the court

in full bench, upon full argument and careful consideration, and no doubt is now entertained by this court of its soundness and propriety.

In that case there was no prescribed rule, either as to conduct or penalty. But it involved directly the prerogative of the teacher as against the exclusive authority of ·the parent over his child, in reference to that child's conduct as affecting the school of which he was a scholar.

In *Sherman* v. *Charleston*, 8 · Cush. 160, the plaintiff was expelled from school on account of licentious and immoral character, though not manifested by any acts within the school. The action was founded on a statute of Massachusetts ·entitling a party to recover damage for being unlawfully excluded from public school instruction. In that case there was no prescribed rule on the subject, either of requirement or penalty. Ch. J. Shaw, in the course of an opinion which would be instructive and salutary to all to read and ponder, says: "It seems to be admitted, if not it could hardly be questioned, that for misconduct in school, for disobedience to its reasonable regulations, a pupil may be excluded. Why so? There is no express provision in the law (as it then was) authorizing such exclusion; it results by necessary implication from the provisions of law requiring good discipline. It proves that *the right to attend is not absolute, but one to be enjoyed by all on reasonable conditions.*" Again: "But the court are of opinion * * * * that a power is vested in the general school committee, or the master with their approbation and direction, to exclude a pupil * * * * * for good and sufficient cause." *Stephenson* v. *Hall*, 14 Barb. 222, was an action against the defendants for expelling, as trustees, the daughter of the plaintiff from a public school. She had been excluded by the teacher for alleged misconduct, with the concurrence of the defendants. On appeal to the superintendent, she was to be permitted to return to the school on certain conditions of promise as to future conduct, with a confession that she had done wrong. She refused to comply with the conditions. Allen, J., in the course of the opinion, says: "It is undoubtedly true that trustees have the power, and it is their duty, to dismiss or exclude a

60

pupil from their school, when in their judgment it is necessary for the good order and proper government of the school so to do."

We have carefully studied the Iowa case of *Morrow* v. *Wood*, before cited, and not only find nothing in conflict with the other cases decided, but that the ideas expressed by Judge COLE are in harmony with the other cases. In that case the teacher required a boy to study geography. His father, for good reasons, wanted him to devote himself to other studies requiring all his time and strength, without geography. The boy, in obedience to his father's direction, refused to study geography, and the teacher whipped him. Hence the suit. It appears that geography was one of the studies required by law to be taught; but there was no law requiring any scholar, or particular description of scholars, to study it. There was no rule of the school besides the arbitrary requirement of the teacher, which would make it the duty of the boy to pursue that study. Judge COLE says, " The statute gives the school board power to make all needful rules and regulations for the organization, gradation, and government of the school, and power to suspend any pupil from the privileges of the school for non-compliance with the rules established by them, or by the teacher with their consent." It does not appear, nor is it inferable, that the school board had made a rule requiring the boy to study geography, or had given their consent to the requirement of the teacher. The question then was, whether the teacher had justifiable cause for whipping the boy. The court held that she had not, and in the discussion, held that on the facts in the case, the father had the right to direct as to the study of geography by his son. We see no occasion for differing with that court in that case. In the course of the opinion it is said: " It is not proposed to throw any obstacle in the way of the performance of their duties " by the school board. Again : "We do not propose to lay down any rule which will interfere with any reasonable regulation adopted for the management and government of the public schools, or which will operate against their efficiency and usefulness. Certain studies are required to be taught in the public schools by statute. The rights of one pupil must be so exercised, undoubtedly, as not to prejudice the equal rights of others. But the parent has the

right to make a reasonable selection from the prescribed studies for his child to pursue, and this cannot possibly conflict with the equal rights of other pupils. In the present case the parent did not insist that his child should take any study outside of the prescribed course ;" " and how it can result disastrously to the proper discipline, efficiency, and well being of the common schools, to concede the paramount right to make a reasonable choice from the studies in the prescribed course which his child shall pursue, is a proposition we cannot understand." And this, as well as all that was said by the judge, is to be taken as in a case where there was no rule as to the study of geography by the boy, except the personal arbitrary command upon him of the teacher. How this court would decide in a case involving the question of superiority of authority between the parent and the school board, as to the pursuit of a study required by the established rule of that board, we have now no occasion to announce or intimate. Nor had that court any such question before it.

In this connection it is interesting to refer to the case of *Spiller* v. *Woburn*, 12 Allen, 127, in which a girl, by direction of her father, refused to bow her head during prayer at the opening of the school, and where the father refused to request that she might not be required to, the rule on that subject providing that scholars would not be required to, whose parents should request that they might not be so required. Ch. J. BIGELOW delivered the opinion of the court, which held that it was lawful for the committee to expel her from the school for such disobedience to the rule. And further, in the same connection, the case of *Spear* v. *Cummings*, 23 Pick. 224, is worthy of attention, in which Ch. J. SHAW says : " The law provides that every town shall choose a school committee, who shall have the general charge and superintendence of all the public schools in such towns " ; that " this includes the power of determining what pupils shall be received and what pupils rejected. The committee may, for good cause, determine that some shall not be received, as for instance, if infected with any contagious disease, or if the pupil or parents shall refuse to comply with regulations necessary to the discipline and good management of the school." These cases show the judicial

views that have been held on the subject under consideration, and suffice for the present.

Recurring now to what is stated in the answer as to the manner in which the rule has been administered, it is proper to remark, that the lawfulness and propriety of the rule are not to be tested or adjudged upon the presumption that the penal part of it will be unjustly or unwarrantably enforced. The presumption is the other way, to wit, that it will be administered justly, and upon, and with reference to, warrantable occasion. If a case should arise in which it should appear that the penalty had been inflicted outside of or beyond the fair scope and reason of the rule, it would be both the province and the duty of the courts to accord proper remedy. But as before demonstrated, this is not such a case. And this leads to the further remark, that the remedy is not sought in this case as against the refusal of leave to be absent on the 4th of June ; but as against the imposing, as the condition of remitting the penalty, a promise that absence for a similar cause should not be repeated that term. Such promise being refused, the penalty of exclusion was not remitted, and the children did not return to the schools ; and hence the position assumed by the orators—the same as already stated—that the committee had not the lawful right to exclude scholars who should be absent by the direction of their parents, contrary to the established rule of the school.

As before intimated, this position takes no account of any difference of occasion or reason for such direction of parents, whether it be religious service or secular employment or amusement, but is on the ground only of the right of the parent as against the rule of the school. In reference to that position, in explicit statement, as the result of the discussion, it is held that scholars of a school are amenable to the school authorities as to their conduct as scholars affecting the school, notwithstanding the prerogative of their parents in respect to them.

This however does not imply that committees or teachers are the ultimate judges whether their measures, either by prescribed rule or extemporized expedient or impulsive act, are lawfully requisite or proper in a given case. The statute, in imposing the

Ferriter et als. *v.* Tyler et als.

duty of adopting all requisite measures, &c., does not confer ultimate jurisdiction on committees, of the question whether a particular measure is requisite or not, within the sense and intent of the statute. When such question of lawfulness under the statute is made between a party against whom the measure operates, and the committee or teacher, that question is open before the courts for consideration and decision, in view of all that appertains to the subject of it. The rule in question in this case, and the enforcement of it, are subject to the judgment of the courts as between the parties to the suit. It is easy to suppose cases in which such enforcement would be beyond the lawful right of the committee. The rule itself, in terms and intent, contemplates exclusion as a penalty only where permission to be absent is withheld for want of reasonable cause shown. In case of casual sickness of the scholar; of sickness or death in the family of the scholar; of some impediment, like fire or flood; in case of various incidents of current life, giving occasion for temporary absence, the enforcement of the penalty of exclusion would, under such circumstances, be adjudged to be unauthorized under the statutes and law by which the subject is governed.

It is not intended by this to be held that there may not be cases in which the decision and action of the committee or teacher would not be deemed judicial and final. That subject has been involved in many of the decided cases, under peculiar statutes, especially in Maine and Massachusetts. We have no occasion to pronounce upon it further in this case.

Upon the facts shown, we are unable to find any warrant of law for maintaining the bill. The decree dismissing it is affirmed. All the judges concurred.