## State of Vermont v. Lisette DeLaBruere and Richard DeLaBruere

[577 A.2d 254]

No. 86-128

Present: Allen, C.J., Peck,[1] Gibson, Dooley and Mahady, JJ.

Opinion Filed April 27, 1990

---

[1] Justice Peck sat for oral argument but did not participate in the decision.

*Jeffrey L. Amestoy*, Attorney General, *Elizabeth J. Grant* and *David Tartter,* Assistant Attorneys General, and *Arthur Gallagher* and *George Kelly*, Law Clerks (On the Brief), Montpelier, for Plaintiff-Appellee.

*Gregory S. Clayton* of *Downs Rachlin & Martin,* St. Johnsbury, for Defendants-Appellants.

*Jean A. Swantko*, Island Pond, for amicus curiae Church at Island Pond.

**Dooley, J.** This is an interlocutory appeal brought by defendants Richard and Lisette DeLaBruere. The defendants were

each charged with one count of violating the compulsory education requirement of 16 V.S.A. §§ 1121 and 1127, for failing to ensure that their son, Luke, attended a school that met the requirements of Vermont law. Before trial, the defendants moved to dismiss the informations on the grounds that: (1) Vermont's compulsory education requirement, as applied to them, violated their right to the free exercise of their religion as guaranteed by the First Amendment to the United States Constitution and Chapter I, Article 3 of the Vermont Constitution; (2) the compulsory education statutes, 16 V.S.A. §§ 1121 and 1127, are unconstitutionally vague; (3) this criminal prosecution violates defendants' right to direct the education of their child; (4) the informations do not charge a crime; (5) the informations fail to charge the essential elements of the crime; and (6) the informations fail to protect defendants against reprosecution. The trial court conducted a hearing on the motion and received evidence relating to defendants' religious beliefs, the nature and conduct of the school which defendants' child attends, and the interests that the State views as paramount in enforcing the statutes involved. The trial court then denied the motion, and this interlocutory appeal followed. We agree with the trial court's decision in denying the motion to dismiss, and, therefore, we remand the case for trial.

Vermont's compulsory education statute requires that:

A person having the control of a child between the ages of seven and sixteen years shall cause the child to attend an approved public school or an approved or reporting private school for the full number of days for which that school is held, unless:

(1) the child is mentally or physically unable so to attend; or

(2) is being furnished with an approved program of home instruction; or

(3) has completed the tenth grade; or

(4) is excused by the superintendent or a majority of the school directors as provided in this chapter.

16 V.S.A. § 1121.[2] A parent who fails to comply with § 1121, upon notice of noncompliance from a teacher or principal to a truant officer pursuant to § 1126, may be subjected to a truancy proceeding under § 1127. See *State v. LaBarge*, 134 Vt. 276, 278–79, 357 A.2d 121, 124 (1976). At issue in this case is the defendants' failure to send their son to an "approved or reporting private school" or to furnish an "approved program of home instruction." The informations charge that on April 3 and 4, 1984 Richard DeLabruere and Lisette DeLabruere, "having control over . . . Luke DeLabruere," a child of school age, neglected without legal excuse to send him to a public school, an approved or reporting private school, or an approved program of home instruction, and that the child was not excused by the superintendent or a majority of the school directors.

For the purposes of this case, the relevant instructional option available to the defendants was to send their children to a reporting private school. This is the least burdensome of the options in § 1121, in the sense that the requirements for fulfilling other options would impose additional intrusions into defendants' religious beliefs. For this reason, this opinion focuses almost solely on the reporting school alternative.

A reporting private school is a school that provides instruction outside the home as an alternative to public schools. The requirements for a reporting private school are enumerated in 16 V.S.A. § 165a,[3] which provides, in pertinent part:

> (a) On presentation in proper form, the state board or its designee shall accept and file a report under this section. No report may be filed earlier than three months before the school year begins.

---

[2] 16 V.S.A. §§ 1121 and 1127, two of the statutes central to this case, have since been amended. The versions involved in this case are contained in 1981, No. 151 (Adj. Sess.), §§ 2, 3. Whenever either statute is cited in the text, the reference is to the version in effect in April, 1984 when the alleged offense occurred.

[3] 16 V.S.A. § 165a has been repealed effective July 1, 1990 by 1989, No. 44, § 7. A new system has been created under which reporting private schools would become recognized, independent schools. See 16 V.S.A. § 166(c). The new system involves more extensive state regulation. The discussion of the regulatory scheme in the text refers to the situation prior to July 1, 1990.

(b) A report under this section is in proper form if it contains:

(1) a statement of the hours and days the school will be in session for the remainder of the school year; and

(2) a statement of the school's objectives which includes, at minimum, the following:

(A) the school will prepare and maintain attendance records for each pupil enrolled or regularly attending classes;

(B) at least once each year the school will assess each pupil's progress and will maintain records of that assessment;

(C) the school will have teachers and materials sufficient to provide the minimum course of study; and

(D) the school's course of study will include the minimum course of study.

. . . .

(e) Each reporting private school shall provide to the commissioner on October 1 of each year the names and addresses of its enrolled pupils. Within seven days of the termination of a pupil's enrollment, the reporting private school shall notify the commissioner of the name and address of the pupil. The commissioner shall forthwith notify the appropriate school officials as provided in section 1126 of this title.

The school must offer a minimum course of study as set forth in 16 V.S.A. § 906(b).[4] That statute provides:

(b) For purposes of this title, the minimum course of study means learning experiences adapted to a pupil's age and ability in the fields of:

---

[4] The reporting private school statute requires reporting and generally contains no penalty if the school fails to fulfill the objectives contained in its statement. It does state, however, that failure to provide a minimum course of study is subject to the provisions of the consumer fraud law and "all the remedies provided therein." 16 V.S.A. § 165a(d). The consumer fraud law provides for a range of remedies including injunctions, civil penalties of up to $10,000 per violation, restitution orders, compensatory damages, attorney's fees and punitive damages. See 9 V.S.A. §§ 2458(a), (b); 2461(b). There are no criminal penalties.

(1) Basic communication skills, including reading, writing, and the use of numbers;

(2) Citizenship, history, and government in Vermont and the United States;

(3) Physical education and principles of health including the effects of tobacco, alcoholic drinks, and drugs on the human system and on society;

(4) English, American and other literature; and

(5) The natural sciences.[5]

A Department of Education official testified that the Department conducts no on-site reviews to ensure that the report is accurate and has "no authority to review whether, in fact, the private reporting school is . . . doing what they say they are doing." There is no further intrusion by the State beyond the reporting. The report is not "approved." Instead, it is placed on file as a registration once it is complete. Of the approximately twenty-four private reporting schools registered under the law, the Department had, as of the date of the hearing in this case, sent back two reports for additional information and, in those cases, filed the reports once the additional information was provided. On these points, the trial court found:

20. All that is required of the reporting private school is that it agree to provide the minimum course of study, state its purposes, state the days and hours of school, provide a list of enrollees and agree to advise the state within 7 days after a child leaves the school of the fact a child is leaving.

. . . .

22. Monitoring whether or not the minimum course of study is being provided is left up to the parents and not the state relative to a reporting private school. The state gets assurance the minimum course of study is being followed in a reporting private school when it gets an application with a list of the student children's names. The only time the state

---

[5] The version of § 906(b) quoted in the text is that in effect at the time of the alleged offense as created by 1981, No. 151 (Adj. Sess.), § 4. The statute has since been amended, primarily to add "the fine arts" to the minimum courses of study. See 1987, No. 132 (Adj. Sess.).

would monitor the church's school would be if a parent or parents complained about the school.

Defendants are members of a church community known as the Church at Island Pond. The Church maintains a program of education for the children of the Church community, and defendants' son Luke is a student at the Church school and has made progress in his learning. The school provides instruction in English, mathematics, history, composition, spelling, music, natural sciences, typing, hygiene, as well as Church doctrine. Approximately twelve members of the Church, having varying levels of education, act as teachers for approximately fifty-five students. Students attend classes during the school year, and receive more informal instruction during the summer months as well. Instruction is both formal and informal, with scheduled classes at various hours during the week and less formal instruction "during all waking hours." The Church has a detailed education plan that continuously assesses progress of the children.

Church doctrine enjoins its members from sending their children to public school because public school values are inconsistent with their faith and religious values. Defendants' religion requires Church members to rule over their children to teach them the way to be righteous. The Church views the State's compulsory attendance statutes as controlling how the Church should educate the members' children. A Church teacher testified that the purpose of the reporting requirement "has nothing to do with helping us to educate our children . . . but is only for the purpose of introducing control of the education of our children into the church." As a matter of religious principle, the Church could not accept State control over the education of its children. The teacher likened the report to be filed for a private reporting school to a report on the Church's religious services and stated that the Church could not file such a report.

The trial court's findings which specifically supported its conclusions that the State's charges against defendants were not invalid on their face were that "[n]either the defendants nor any Island Pond Church members have ever gone to the State Department of Education for approval of a reporting private

school or home study program" and that "[n]o Church children are receiving education at a state approved educational home study or reporting private school program." On the other hand, the trial court found that it does not violate the religious beliefs of members of the Church to reveal the educational program of the children and the names of "some of the children." The court also found that the Church will not give the State the names of members' children in the school generally because of its perception of the State's motives, but that the State's responsibility to be certain that children obtain a minimum education is not offensive to Church doctrine.

The trial court found that the school satisfies the minimum course of study requirement, but concluded that, given noncompliance with §§ 1121 and 1127, the State's pending action did not violate defendants' rights under the United States or Vermont Constitutions. The specific issues are set forth in the court's order granting permission to take an interlocutory appeal under V.R.A.P. 5:

1. Does the criminal prosecution of the Defendants under the Vermont Compulsory Education Statute violate their freedom of religion as guaranteed under the United States and Vermont Constitutions?

2. Is the Vermont Compulsory Education Statute an unconstitutionally vague criminal statute, in violation of the United States and Vermont Constitutions?

3. Does the criminal prosecution of the Defendants under the Vermont Compulsory Education Statute violate their right to substantive due process as guaranteed by the United States Constitution?

4. Does the two-day absence from school alleged in the informations filed against the Defendants constitute a crime under the Vermont Compulsory Education Statute?

5. Are the informations filed against the Defendants defective because they fail to allege the essential elements of the crime of violating the Vermont Compulsory Education Statute?

6. Are the informations filed against the Defendants defective under the United States and Vermont Constitutions because they fail to protect Defendants from reprosecution for the same offense?

The trial court answered questions 1, 2, 3, 5, and 6 in the negative, and question 4 in the affirmative. Although our reasoning may differ from that of the trial court on some of the questions, our answers to the questions are the same as those of the trial court.

## I.

Defendants on appeal here concede that the Church school has not reported within the meaning of 16 V.S.A. § 165a, and acknowledge that they have failed to send their son to a reporting school, as required by § 1121. Defendants contend, however, that the Church is entitled to an exemption from application of the statutory reporting requirements, based on the free exercise guarantees of the First Amendment to the United States Constitution[6] and Chapter I, Article 3 of the Vermont Constitution,[7] and that they are thereby immune from truancy prosecution under § 1127. In response, the State asserts that the reporting requirements do not unduly burden their right to free

---

[6] Amendment I provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

[7] Chapter I, Article 3 provides:

> That all men have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings, as in their opinion shall be regulated by the word of God; and that no man ought to, or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of his conscience, nor can any man be justly deprived or abridged of any civil right as a citizen, on account of his religious sentiments, or peculia[r] mode of religious worship; and that no authority can, or ought to be vested in, or assumed by, any power whatever, that shall in any case interfere with, or in any manner control the rights of conscience, in the free exercise of religious worship. Nevertheless, every sect or denomination of christians ought to observe the sabbath or Lord's day, and keep up some sort of religious worship, which to them shall seem most agreeable to the revealed will of God.

exercise of religion, and that the defendants are liable for prosecution for their failure to comply with § 1127.

Although defendants have relied primarily on the Vermont Constitution, we start our analysis with the First Amendment to the United States Constitution, both because the state and federal cases interpreting this provision represent a prodigious body of precedent and because use of common authority gives this Court a basis on which to compare the decisions from other courts. We will then address defendants' arguments that the Vermont Constitution affords them such greater protection that it requires that this truancy proceeding be dismissed.

The Free Exercise Clause of the First Amendment protects both freedom to believe and the freedom to act. The freedom to believe is an absolute one, but the freedom to act is necessarily limited. *Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972). As the Supreme Court said in *Yoder*:

> [A] State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce* [*v. Society of Sisters*, 268 U.S. 510, 535 (1925)], "prepare [them] for additional obligations."

*Id.* at 214. The distinction between belief and actions, though significant, does not control the outcome of the case under the First Amendment as "there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability." *Id.* at 220.[8] See also *Hobbie v. Unem-*

---

[8] We do not believe that this holding in cases involving the right of parents to direct the education of their children is changed by the recent opinion in *Employment Division v. Smith*, — U.S. —, —, 110 S. Ct. 1595, 1601–03 (1990). In the lexicon of that decision, this is a "hybrid situation" implicating more than a free exercise claim and, thus, the State must show more than that the truancy law is of general applicability and is valid and neutral. See *id.* at —, 110 S. Ct. at 1599–1601.

*ployment Appeals Commission of Florida,* 480 U.S. 136, 144 (1987); *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 719 (1981); *Sherbert v. Verner,* 374 U.S. 398, 406–09 (1963); and *Cantwell v. Connecticut,* 310 U.S. 296, 303–04 (1940).

The current legal test to determine whether the Free Exercise Clause of the First Amendment is violated by requirements of state law is often presented as comprising four elements:

(1) Whether plaintiffs' challenge is motivated by a sincerely held religious belief;

(2) Whether plaintiffs' free exercise of religion is burdened by the challenged government action;

(3) Whether the challenged government conduct serves a compelling state interest; and, if so

(4) Whether the government has proven that the challenged conduct is essential to achieving, or is the least restrictive means of achieving, that compelling state interest.

*Lyng v. Northwest Indian Cemetery Protective Association,* 485 U.S. 439, 447 (1988); *Hobbie v. Unemployment Appeals Commission,* 480 U.S. at 138–44; *Blount v. Department of Educational & Cultural Services,* 551 A.2d 1377, 1379 (Me. 1988); Choper, *Defining "Religion" in the First Amendment,* 1982 U. Ill. L. Rev. 579; *Developments in the Law—Religion and the State,* 100 Harv. L. Rev. 1606, 1703–40 (1987). In this case, we need give no further consideration to the first element of the test; the State concedes that defendants' failure to enroll their child in a reporting private school and the Church's failure to report to the state are motivated by a sincerely held religious belief.

## A.

In a First Amendment case, the party asserting the violation has the initial burden of proving that the state requirement or restriction imposes a burden on religious belief or practice. *Abington School District v. Schempp,* 374 U.S. 203,

223 (1963).[9] Defendants rely on the coercive nature of the government regulation on the education of their child to demonstrate a burden on their religious belief. The situation is, in their view, akin to that in *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. at 717–18:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith . . . thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

As in *Thomas*, the burden here is indirect, in the sense that the purpose of the Vermont reporting statute is secular and is not intended to have direct impact on religious belief or action.

The situation differs from *Thomas* since defendants are not affirmatively seeking a benefit and indeed are attempting to educate their child with as little contact as possible with the government. If anything, the difference strengthens their burden argument since they face a criminal sanction for doing what they assert their religion requires. See *State v. Shaver*, 294 N.W.2d 883, 892 (N.D. 1980). Consequently, though the government does not seek to impose a direct burden, and defendants do not seek a benefit, their dilemma falls squarely within the doctrine of indirect compulsion. See *North Valley Baptist Church v. McMahon*, 696 F. Supp. 518, 525 (E.D. Cal. 1988) (California preschool licensure requirements burden the religious expression of operators who believe that licensing involves the authority of the state over Jesus Christ in operation of the church itself).

The trial court concluded that the reporting requirements burdened defendants' religious belief "to a slight degree." In a very similar case, the Eighth Circuit Court of Appeals characterized the burden as "very minimal." *Fellowship Baptist Church v. Benton*, 815 F.2d 485, 491 (8th Cir. 1987). The State

---

[9] "Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against [the party] in the practice of [its] religion." 374 U.S. at 223.

goes further and argues that whatever the theoretical burden, the defendants failed to establish that compliance with the law interferes with the exercise of their religious beliefs. See *State v. Andrews*, 65 Haw. 289, 291–92, 651 P.2d 473, 475 (1982); *Roloff Evangelistic Enterprises v. State*, 556 S.W.2d 856, 858 (Tex. Civ. App. 1977).

We agree there are gaps in defendants' evidence on the nature of the burden. Putting their evidence in the best light, defendants appear to state the elements of the interference with their religious belief as follows: (1) education of Church children is part of their religious practice, and it is not possible to separate out a secular education component from the religious practice; (2) the act of reporting information to the State is an acceptance that the State controls some aspect of the education provided by the Church; and (3) State control of the Church's religious practices is directly contrary to the primacy of God over man and cannot be accepted. From the State's perspective this is a symbolic, but not actual, burden because the act of reporting does not equal control. Further, there is no actual conflict over the content of the State's regulation since it is agreed that the Church school meets the minimum course of study contained in 16 V.S.A. § 906(b) and the State does not regulate course content. The trial court found, however, that the reluctance of the Church to specify the names of the children attending the Church school appears to arise from mistrust of State motives rather than religious convictions, especially since the Church recognizes the State's right to insure that children receive some form of education.

While there is force to the State's position here, we note that virtually every conflict between a state and parents who claim the right to be free of state control of the education of their children because of an interference with religious beliefs involves the fact that state regulation exists at all and not the content of the regulation. See, e.g., *New Life Baptist Church Academy v. Town of East Longmeadow*, 885 F.2d 940, 943 (1st Cir. 1989); *Blount v. Department of Education & Cultural Services*, 551 A.2d at 1378; *Blackwelder v. Safnauer*, 689 F. Supp. 106, 130 (N.D.N.Y. 1988). Indeed, in many cases, the

court found that the parents or the religious school had met all requirements of state regulation but refused to seek and accept the official determination of compliance. See, e.g., *State ex rel. Douglas v. Faith Baptist Church*, 207 Neb. 802, 817, 301 N.W.2d 571, 580 (1981). Although there are no doubt major differences in the religious beliefs involved, virtually every case of conflict is grounded on the inability of the religious adherents to separate secular education from religious education.

■ We are sensitive to the "most delicate question" before us and wish to take care not to judge the degree of defendants' beliefs. *Wisconsin v. Yoder*, 406 U.S. at 215–16. Accordingly, we resist the State's invitation to hold there is no burden because our view of what is a necessary conflict differs from that of defendants. We must accept on face value that the symbols of state regulation are as religiously important to defendants as the actuality of state control over their religious education.

## B.

■ Having determined that defendants have shown a burden on their free exercise right, we do not necessarily conclude that defendants must be exempted from the statutes at issue. The State may justify the burden on religious belief or practice by demonstrating a compelling state interest.[10] *Thomas*, 450 U.S. at 718. However, it is incumbent upon the Court to "searchingly examine" the State's interest and the detrimental effect that might result from exempting defendants from the requirements of state law. *Yoder*, 406 U.S. at 221.

The factors to be included in weighing a state's compelling interest are necessarily broad:

> The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.

---

[10] The recent opinion in *Employment Division v. Smith*, — U.S. at —, 110 S. Ct. at 1603–05, appears to direct that the State, in this case, need meet only a reasonable relationship standard. Since we find that the State has shown a compelling state interest, we would necessarily also find that the State has met the lesser burden of *Smith*.

*Yoder*, 406 U.S. at 215; see also *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. at 718. But there can be little doubt today that the interest of a state in public education is among its most compelling considerations:

> [E]ducation is perhaps the most important function of state and local governments. . . . It is the very foundation of good citizenship. . . . In these days, it is doubtful that any child may reasonably be expected to succeed in life . . . denied the opportunity of an education.

*Brown v. Board of Education*, 347 U.S. 483, 493 (1954). Nor can there be any doubt that the state's paramount interest in education extends to private schools:

> No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.

*Pierce v. Society of Sisters*, 268 U.S. 510, 534 (1925).

A state's compelling interest in these and similar values has been overwhelmingly sustained in cases both in state and federal courts. See *Murphy v. Arkansas*, 852 F.2d 1039, 1041 (8th Cir. 1988) (Home School Act, requiring submission of information to the state, did not violate Free Exercise Clause); *North Valley Baptist Church v. McMahon*, 696 F. Supp. at 526–27 (regulation of preschool supported by compelling state interest which is "particularly acute"); *Blount*, 551 A.2d at 1381 (prior approval by state of home-schooling upheld under United States and Maine Constitutions); *Sheridan Road Baptist Church v. Department of Education*, 426 Mich. 462, 486, 396 N.W.2d 373, 383 (1986) (curriculum and teacher certification requirements did not violate the religion clauses of First Amendment); *Faith Baptist Church*, 207 Neb. at 811–12, 301 N.W.2d at 577 (reporting and teacher certification requirements upheld in suit to enjoin operation of noncomplying religious school);

*State v. Rivinius*, 328 N.W.2d 220, 227–29 (N.D. 1982) (upholding truancy conviction, based on validity of teacher certification requirement as applied to parochial school).

The overriding importance of education in Vermont has never been in doubt. As of July, 1777, ten of the colonial states had adopted new constitutions, and of these only three had included provision for education:

> Vermont, however, had framed into her fundamental law provision for the education of all,—an education graded, progressive and complete; or primary, academic and university. And this, too, at a time when boys of sixteen were compelled to bear arms, and when the question whether there would ever be any State of Vermont was still an open one.

A.D. Barber, *Vermont as a Leader in Educational Progress*, address before the Vermont Historical Society, 1896, in "Essays in the Social and Economic History of Vermont" 303 (1943).

█ When we look at the specific areas where the State has chosen to regulate private schools, the interests of the State are equally compelling. The testimony of the Deputy Commissioner of Education supported the State's argument that it has a compelling interest in the minimum course of study, which is designed to require the minimum education necessary "[s]o the state in a sense can sustain itself," and see that each child receives the skills necessary to function as an adult; so that "no child comes out in society without having those skills, those tools so that they can survive from day-to-day," and that each is equipped to choose where to work and how to live. The trial court reasonably concluded that:

> the State has a . . . legitimate and compelling interest in assuring that all children in Vermont are taught a minimum course of study to insure that every child receives the minimum education necessary to obtain basic skills to function as an adult, to participate in the work place and the community, to provide the means for making choices and or the State to maintain self-government.

(Citations omitted.)

✦

The State's interest in knowing which children are attending a particular school is obvious. It is a way to determine that each Vermont child is being educated. Once we recognize that the State can require all children of proper age to attend some school, we must also recognize a method to implement the State's requirement.

## C.

Our last inquiry is whether the government has proven that its interest, though compelling, is realized by the least restrictive means, given the clear burden on defendants' beliefs and practices. The First Amendment imposes a high duty on the State and on this Court to find, if possible, a pathway through the thicket of conflict that leaves both religious adherents and the State with their core interests, if not perfectly preserved, at least substantially intact. The cautionary guidelines from the Supreme Court are clear:

> [C]ourts must move with great circumspection in performing the sensitive and delicate task of weighing a State's legitimate social concern when faced with religious claims for exemption from generally applicable educational requirements.

*Yoder*, 406 U.S. at 235.

Defendants' main claim regarding this element of the free exercise test is that the intrusion on their religious liberty is so great and the State's interest is so weak that only an exemption from all governmental regulation will pass constitutional muster. This exemption would necessarily leave the State's interest unprotected, but defendants assert that this result is commanded by the holding in *Yoder*.

*Yoder* involved a conflict between the Wisconsin compulsory education laws and the Amish practice of withdrawing children from public education after the eighth grade and providing informal vocational education thereafter. As a result, Amish children received no formal schooling, as required by state law, between the ages of fourteen and sixteen years. In a truancy proceeding against Amish parents, the United States Supreme Court held that the First Amendment exempted Amish parents

from compulsory education laws for the two-year period because the laws denied defendants the free exercise of their religious belief. *Id.* at 234.

*Yoder* involved an extensive record about the Amish way of life and the role of children's education in maintaining the Amish community. The Court summarized the findings of its balancing of the defendants' and state's interests as follows:

> Aided by a history of three centuries as an identifiable religious sect and a long history as a successful and self-sufficient segment of American society, the Amish in this case have convincingly demonstrated the sincerity of their religious beliefs, the interrelationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization, and the hazards presented by the State's enforcement of a statute generally valid as to others. Beyond this, they have carried the even more difficult burden of demonstrating the adequacy of their alternative mode of continuing informal vocational education in terms of precisely those overall interests that the State advances in support of its program of compulsory high school education. In light of this convincing showing, one that probably few other religious groups or sects could make, and weighing the minimal difference between what the State would require and what the Amish already accept, it was incumbent on the State to show with more particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption to the Amish.

*Id.* at 235–36. In a number of places in the opinion, the Court characterized what was at stake for the Amish community. For example, it found:

> In sum, the unchallenged testimony of acknowledged experts in education and religious history, almost 300 years of consistent practice, and strong evidence of a sustained faith pervading and regulating respondents' entire mode of life support the claim that enforcement of the State's requirement of compulsory formal education after the eighth

grade would gravely endanger if not destroy the free exercise of respondents' religious beliefs.

*Id.* at 219. Although the Court found that compulsory education in a curriculum equivalent to that in the public schools would infringe defendants' religious liberty, it did not suggest that all governmental regulation of Amish education was constitutionally prohibited. It concluded by emphasizing that:

> Nothing we hold is intended . . . to limit the power of the State to promulgate reasonable standards that, while not impairing the free exercise of religion, provide for continuing agricultural vocational education under parental and church guidance by the Old Order Amish or others similarly situated. The States have had a long history of amicable and effective relationships with church-sponsored schools, and there is no basis for assuming that, in this related context, reasonable standards cannot be established concerning the content of the continuing vocational education of Amish children under parental guidance . . . .

*Id.* at 236.

The record in this case is far different from that in *Yoder*. Not only does the record lack the expert evidence of defendants' way of life, their history and interrelationship with belief, and the essential elements for survival, it clearly demonstrates that the conflict here in no way threatens that way of life or the core religious values. Where *Yoder* was a conflict over educational policy—the nature and content of a "curriculum" and how children would be educated and by whom—this is a dispute over the symbol of state regulation where there is no policy conflict. The Court's acceptance of a state role in regulation of the content of Amish vocational education shows that the opinion cannot be read to validate a free exercise challenge against the fact of state regulation rather than its content. See *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971) (state has legitimate concern to maintain minimum standards "in all schools it allows to operate"). Moreover, in *Yoder*, the time in issue was only two years of the life of a child who had gone through public school. In this case, defendants' position would deny all state involvement in the education of children throughout their age of eligibility for

public schooling or its equivalent. While much of the state's interest remained intact in *Yoder*, none would remain intact here.

Following *Yoder*, there have been extensive challenges to state regulation of home education or private schooling based on assertions of religious liberty. With only isolated exceptions, neutral and reasonable state regulations affecting home schooling and private education have been upheld against free exercise challenges. See *New Life Baptist Church Academy v. Town of East Longmeadow*, 885 F.2d at 951–52 (regulation of curriculum and teacher certification, with required information gathering procedures); *Murphy v. Arkansas*, 852 F.2d at 1043 (testing); *Fellowship Baptist Church v. Benton*, 815 F.2d at 492–95 (reporting and teacher certification); *Blackwelder v. Safnauer*, 689 F. Supp. at 135 (substantial equivalency requirements for home schooling); *Johnson v. Charles City Community Schools Bd.*, 368 N.W.2d 74, 79–81 (Iowa 1985) (reporting, standards and teacher certification); *Blount v. Department of Education & Cultural Services*, 551 A.2d at 1383–84 (home schooling regulation); *In re Care & Protection of Charles*, 399 Mass. 324, 339–40, 504 N.E.2d 592, 602 (1987) (home schooling regulation); *Attorney General v. Bailey*, 386 Mass. 367, 376, 436 N.E.2d 139, 148 (1982) (reporting); *Sheridan Road Baptist Church v. Department of Education*, 426 Mich. at 484, 396 N.W.2d at 382–83 (3–3 affirmance) (teacher certification); *State v. Faith Baptist Church*, 207 Neb. at 817, 301 N.W.2d at 579 (curriculum); *State v. Patzer*, 382 N.W.2d 631, 639 (N.D. 1986) (teacher certification requirement for home schooling); *State v. Schmidt*, 29 Ohio St. 3d 32, 35, 505 N.E.2d 627, 629–30 (1987) (home schooling); *State v. Riddle*, 285 S.E.2d 359, 365 (W. Va. 1981) (home schooling). In almost every one of these cases, the main objection was to the fact of state involvement or regulation and not to the content. See, e.g., *Blount v. Department of Education & Cultural Services*, 551 A.2d at 1380 (parents would cooperate with the state "only if the State will acknowledge that its role is purely advisory").

A number of the cases have involved reporting requirements which are factually indistinguishable from those in this case. In *Fellowship Baptist Church v. Benton*, 815 F.2d at 490–92, the

Church school challenged the Iowa requirement that it report the names, ages and number of days of attendance of each pupil along with the names of teaching texts and teachers. The court upheld the Iowa requirement, holding that the "burden on plaintiff[s'] . . . religious beliefs—if one exists at all—is very minimal and is clearly outweighed by the state's interest in receiving reliable information about where children are being educated and by whom." *Id.* at 491. The court rejected the alternative of parental reporting, holding that it was inadequate to serve the state's interest. See *id.*; see also *Mazanec v. North Judson-San Pierre School Corp.*, 798 F.2d 230, 235 (7th Cir. 1986) (consistent with Free Exercise Clause, state can create "mechanism to monitor compliance with the law"); *Johnson v. Charles City Community Schools Bd.*, 368 N.W.2d at 80 (since state can "reasonably regulate the basic educational requirements of all children within its borders," it can "inquire into private educational institutions in order to see this is done").

Similarly, in *Attorney General v. Bailey,* 386 Mass. at 376-77, 436 N.E.2d at 146, the court upheld a requirement that private schools must report the names of students. The court found that the reporting requirements imposed only an "incidental burden" on defendants' right to practice their religion and that because the school and parents were free to teach religious doctrine to those children who attended the private school, the state's interest in determining whether all children were in compliance with compulsory attendance law was paramount. *Id.*

■ We see neither a less restrictive alternative to the reporting requirement in this case, nor a valid claim for exemption from all regulation through compulsory education laws. Accordingly, subject to the resolution of two additional arguments, we find that enforcement of the compulsory education laws in this case is consistent with the First Amendment to the United States Constitution.

■ The first additional argument is that the state regulation is so limited that it is wholly ineffectual and should not be en-

forced against the claim of religious liberty. There is no question that Vermont has adopted a very limited regulatory scheme that relies mainly on the good faith of private schools in reporting. The state regulation also empowers parents to ensure that their children are receiving the educational program they were promised. See *Blount v. Department of Education & Cultural Services*, 551 A.2d at 1383 (reporting is an appropriate alternative for a Christian school because the parents serve as "active intermediary and monitor"). It is consistent with the State's view of its interest as "ensuring that the children residing within the State receive an education, not that the educational process be dictated in its minutest detail." *In re Care & Protection of Charles*, 399 Mass. at 336, 504 N.E.2d at 600.

There is an irony in the claim that the State's private school reporting statute is so weak that it cannot stand against a free exercise claim. The statute was adopted in 1982 as a compromise acceptable to religious educators who believed that they could report basic information to the state but could not accept on-site inspection. See Note, *State Regulation of Private Church Schools: An Examination of Vermont's Act 151*, 8 Vt. L. Rev. 75, 105 (1983) (details position of religious educators in House and Senate Education Committees). In many free exercise cases, parents and religious educators have argued for a reporting scheme as an alternative to the state regulation, asserting that only a reporting system can be a least restrictive alternative to justify intrusion on religious exercise. See, e.g., *Blount v. Department of Education & Cultural Services*, 551 A.2d at 1383. In an area where we strive to accommodate competing claims by insisting that the State implement its interests with the least possible effect on religiously motivated conduct, we cannot find that the resulting state requirements are too weak to be upheld.

■ Finally, the parents point out that although the dispute here is between the Church and the State, they, rather than the Church, are facing a criminal sanction. We agree with the Supreme Court of Nebraska that when the State acts to set minimum educational standards:

[C]ompliance with them falls within the ambit of the fundamental contract between the citizen and society. It need scarcely be said that each of us, in order to enjoy membership in an organized social order, is pledged to adhere to a number of minimum norms. Of these, one of the most central is society's duty to educate its children.

The nature and extent of education remains largely a matter of personal choice. But there are basic minimums and, this being true, it is up to the people as a whole to set them. One way they have done this is to enact compulsory education statutes.

*Johnson v. Charles City Community Schools Bd.*, 368 N.W.2d at 79. Thus, a state may require school attendance for children within a specified age and punish the parents for their child's truancy. See *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Howell v. State*, 723 S.W.2d 755, 757 (Tex. Crim. App. 1986) (citing cases from other states). Many of the challenges to state approval of religious schools and education arise in truancy cases, and the courts have generally upheld the right of the state to prosecute the parents despite their reliance on the free exercise of their religion. See, e.g., *State v. Shaver*, 294 N.W.2d at 899–900.

We are sensitive to the danger of equating the interests of the parents and those of the Church in a truancy case. For two reasons, however, we do not believe the trial court was required to explore the differences in the two interests in this case.

First, the evidence put forward by the defendants here emphasized the unity of interest of the Church and the parents. We recognize that this case is different from others that have come before the courts because defendants are Church members who live, work and worship in a Church community. Although the testimony failed to explore the issue in any detail, we infer that the parents' only real choice is between the Church school and the public school. Nothing in the record suggests, however, that the Church cannot change its policies to comply with the reporting school requirements or that parents cannot control that

policy.[11] Nor are we prepared to say, given the compelling interest of the State and the lack of less restrictive alternatives, that we will uphold defendants' free exercise challenge even if the Church refuses to comply with the reporting school requirements.

Second, there is no indication that the parents have made any attempt to reconcile the conflict between state requirements and Church policy. Their position is similar to that in *State v. Riddle*, 285 S.E.2d at 364, where the court concluded that "it is not appropriate for a person entirely to disregard the statute, await criminal prosecution, and then assert a first amendment defense." Defendants have the burden to establish an exception to the compulsory education responsibility. See *State v. McCaffrey*, 69 Vt. 85, 90–91, 37 A. 234, 235–36 (1896). They have failed to meet this burden.

## II.

As we indicated at the beginning of this opinion, defendants primarily rely on Chapter I, Article 3 of the Vermont Constitution. That Article provides:

> That all men have a natural and unalienable right, to worship Almighty God, according to the dictates of their own consciences and understandings, as in their opinion shall be regulated by the word of God; . . . and that no authority can, or ought to be vested in, or assumed by, any power whatever, that shall in any case interfere with, or in any manner control the rights of conscience, in the free exercise of religious worship.

Defendants see, in the wording of the article and its history, additional personal protections that require that this truancy action be dismissed. As noted in *State v. Jewett*, 146 Vt. 221, 225–27, 500 A.2d 233, 236–37 (1985), we have a number of approaches available in construing our constitution including historical analysis, examination of the text, constructions of

---

[11] We also cannot preclude the possibility that defendants could comply with the home schooling alternative of the law, a subject also not explored in the evidence.

identical or similar provisions in other state constitutions, and use of sociological materials. The parties have used all these approaches in this case. Before turning to some of these approaches, we first look to our own decisions construing Article 3.

The first important precedent is *Ferriter v. Tyler*, 48 Vt. 444 (1876), where parents of children enrolled in the public schools in Brattleboro sued the school committee (prudential committee) because their children were expelled when they did not attend school on a Roman Catholic religious holiday in order to attend church services. The Court dismissed the action because it was brought by the parents, and their religious liberties, as opposed to those of the children, had not been infringed.

The Court went on, however, to examine the issue as if the case had been brought by the children and found there was no violation of Article 3. In reaching that result, the Court construed Article 3 primarily as an anti-discrimination provision. The essence of the Court's opinion is in the following language:

> Let it be repeated then, that that article in the constitution was not designed to exempt any person or persons of any sect, on the score of conscience as to matters of religion, from the operation and obligatory force of the general laws of the state authorized by other portions of the same instrument, and designed to serve the purposes contemplated by such other portions; it was not designed to exempt any persons from the same subjection that others are under to the laws and their administration, on the score that such subjection at times would interfere with the performance of religious rites, and the observance of religious ordinances, which they would deem it their duty to perform and observe but for such subjection. While all stand on equal footing under the laws, both as to benefits and privileges proffered, and as to exactions made, and liabilities, and penalties imposed, no one's rights of conscience, as contemplated by said Art. III., are violated in a *legal* sense. And it is fitting here to remark, that this court have to deal with the subject as *jurists*, regarding the constitution and the laws, and what is done under them, with reference to

principles and reasons that appertain to the subject in its legal elements, qualities, and aspects, and not as religionists, not as sectaries, not as those who regard something besides the government as of ultimate supremacy in the affairs of men on earth, but as those who regard the government created by the constitution, and the laws made under the authority and within the scope of the constitution, as the ultimate sovereignty in this state, and as equally obligatory and effectual upon all.

48 Vt. at 469 (emphasis in original).

There was little additional analysis of Article 3 until this Court decided two cases dealing with whether state aid to religious schools created a state establishment of religion. See *Swart v. South Burlington Town School District*, 122 Vt. 177, 167 A.2d 514, *cert. denied*, 366 U.S. 925 (1961); *Vermont Educational Buildings Financing Agency v. Mann*, 127 Vt. 262, 247 A.2d 68 (1968). *Swart* describes some of the history of Article 3 and observes that:

In Vermont, the militant sense of freedom which directed its founders to be the first to write a prohibition against slavery in the establishment of the independent state in 1777, was somewhat reserved in expression of religious liberty.

122 Vt. at 182, 167 A.2d at 517. The Court noted that the original version of Article 3, in the 1777 Constitution, limited the protection of the anti-discrimination language to those who professed the protestant religion. This limitation was added onto the Pennsylvania provision, which we otherwise adopted, because the framers of our constitution were fearful that the religious liberty allowed by the Pennsylvania version "would be somewhat larger than the people of New England had been accustomed." *Id.* (quoting D. Chipman, A Memoir of Thomas Chittenden at 84 (1849)). The 1786 version of the constitution dropped the limitation of the anti-discrimination protection to protestants and, as discussed below, added additional language to the Pennsylvania model. In *Vermont Educational Buildings Financing Agency*, we noted that in establishment of religion cases, the protections of the First Amendment to the United

States Constitution are greater than those in Article 3. 127 Vt. at 269, 247 A.2d at 73.

Two other recent cases deserve some mention. In *State v. Chambers*, 144 Vt. 234, 238, 477 A.2d 110, 112 (1984), defendant was convicted of burying his daughter without a burial permit and appealed, arguing that the conviction violated his right to free exercise of religion under the First Amendment and Article 3. We disposed of the constitutional claims, citing only to *Wisconsin v. Yoder*, on the basis that defendant failed to show that his claim was based on "deep religious conviction," suggesting that the tests under the federal and the state constitutions are identical. In *Beauregard v. City of Saint Albans*, 141 Vt. 624, 631–32, 450 A.2d 1148, 1152 (1982), we found that a will provision restricting the religious affiliation of those serving on the school board for a public high school violated Article 3. We found that the article prohibits "mere interference" in the rights of conscience in the free exercise of religious worship. Under that standard, the article was violated because defendant "must either abandon his faith or convert in order to participate in the administration of his local school board." *Id.* at 632, 450 A.2d at 1152.

We find little in our case law to assist defendants in this case. Although *Swart* is an establishment of religion case, its conclusion that Vermont did not adopt an expansive religious liberty provision actually relates to the protection of the free exercise of religion. This is consistent with *Ferriter v. Tyler*, which adopts a view of Article 3 that affords less protection to religious liberty than is now afforded under the First Amendment. Although the more recent language in *Beauregard* is broad, the decision contains no real analysis, and the case before the Court fell squarely within the anti-discrimination construction of Article 3 announced in *Ferriter*. Based on these cases, we would have to conclude that at least with respect to the claims made in this case, we can find no basis for the argument that the Vermont Constitution affords additional protection to defendants such that they may not be prosecuted for truancy.

The parties have briefed a number of arguments for which the defendants suggest a different result than our precedents

command. We will analyze in some detail cases from other states since such analysis has been particularly helpful on other state constitutional questions. See *State v. Dean*, 148 Vt. 510, 515–16, 536 A.2d 909, 913 (1987); *State v. Picknell*, 142 Vt. 215, 227, 454 A.2d 711, 716 (1982). As noted above, Article 3 was derived from a very similar provision of the Pennsylvania Constitution (now Article 1, § 3). Approximately fourteen states have provisions modeled on the Pennsylvania Constitution although the language varies somewhat. In ten of these states, the courts have either held that their constitutional provision offers the same level of protection to the free exercise of religion as the First Amendment or have decided free exercise cases involving their constitutional provision solely on federal precedents. See *Cude v. State*, 237 Ark. 927, 932, 377 S.W.2d 816, 819 (1964) (relying on federal precedents, court holds that Arkansas Constitution "does not mean that parents, on religious grounds, have the right to deny their children an education"); *Lynch v. Indiana State Univ. Bd. of Trustees*, 177 Ind. App. 172, 177–84, 378 N.E.2d 900, 904–06 (1978) (analyzes free exercise case under First Amendment and Article I, §§ 2–4 of the Indiana Constitution solely through federal precedents); *State ex rel. Pringle v. Heritage Baptist Temple, Inc.*, 236 Kan. 544, 546–47, 693 P.2d 1163, 1165–66 (1985) (analyzes free exercise claim under First Amendment and § 7 of the Kansas Bill of Rights by the three-part test of *Wisconsin v. Yoder*); *Dotter v. Maine Emp. Sec. Comm'n*, 435 A.2d 1368, 1374 n.2 (Me. 1981) (scope of right to religious liberty in Maine Constitution is co-extensive with that afforded by the First Amendment);[12] *State by McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 851–53 (Minn. 1985) (analyzes free exercise claim under First Amendment and Article I, § 16 of the Minnesota Constitution solely based on federal precedents, over a dissent urging a different result using the Minnesota Constitution); *Penner v. King*, 695 S.W.2d 887, 890–91 (Mo. 1985) (en banc) (analyzes free exercise claim under First Amendment and Article I, § 5 of

---

[12] See also *Blount v. Department of Education & Cultural Services*, 551 A.2d at 1385 (full range of protections of Maine Constitution is also available under the United States Constitution).

the Missouri Constitution based solely on federal precedents with concurrence that court should meaningfully implement the Missouri Bill of Rights);[13] *In re Williams*, 269 N.C. 68, 78, 152 S.E.2d 317, 325 (1967) (freedom protected by Article I, § 26 of the North Carolina Constitution is no more extensive than freedom to exercise one's religion, protected by the First Amendment); *In re Milton*, 29 Ohio St. 3d 20, 23–26, 505 N.E.2d 255, 258–60 (1987) (analyzes free exercise claim under First Amendment and Article I, § 7 of the Ohio Constitution solely based on federal constitutional law precedents);[14] *Wiest v. Mt. Lebanon School Dist.*, 457 Pa. 166, 174, 320 A.2d 362, 366–67 (1974) (the protection of Article I, § 3 of the Pennsylvania Constitution "does not transcend the protection of the First Amendment of the United States Constitution"); *State ex rel. Warren v. Nusbaum*, 55 Wis. 2d 316, 332, 198 N.W.2d 650, 658 (1972) (while words differ, both Article I, § 18 of the Wisconsin Constitution and the First Amendment "are intended and operate to serve the same dual purpose of prohibiting the 'establishment' of religion and protecting the 'free exercise' of religion").

Of the remaining states, only three have any decisions that remotely help the defendants. Defendants rely heavily on a decision from the Supreme Court of Tennessee, *State ex rel. Swann v. Pack*, 527 S.W.2d 99 (Tenn. 1975), as establishing greater protections for free exercise claims under Article I, § 3 of the Tennessee Constitution. *Pack* involved a suit brought by the state to enjoin a pastor and elder of the Holiness Church from handling poisonous snakes as part of religious services. *Id.* at 102–03. The court held that the defendant's conduct was not protected by either Article I, § 3 of the Tennessee Constitution or the First Amendment. In reaching this decision, how-

---

[13] The concurring opinion would have reached a different result than the majority but closed by stating: "I serve no useful purpose by dissenting again and again." 695 S.W.2d at 894 (Donnelly, J., concurring). But see *Waites v. Waites*, 567 S.W.2d 326, 331 (Mo. 1978) (en banc) (in establishment cases, Missouri Constitution "is more 'restrictive' than the First Amendment").

[14] See also *South Ridge Baptist Church v. Industrial Comm'n of Ohio*, 676 F. Supp. 799, 808 (S.D. Ohio 1987) (Ohio courts have given no indication that they would apply Article I of the Ohio Constitution more stringently than the United States Supreme Court has applied the First Amendment).

ever, the court characterized Article I, § 3 of the Tennessee Constitution as "substantially stronger" than the First Amendment and stated that the state's burden was to show "a clear and present danger to the interests of society." *Id.* at 111. From these statements, defendants argue that the Tennessee Constitution requires a greater showing by the state to defeat a free exercise claim—instead of a "compelling state interest," defendants argue the state must show "a clear and present danger"—and Vermont should adopt a similar requirement.

We cannot read *Pack* as broadly as the defendants. The court stated specifically that the First Amendment also required the state to show a clear and present danger, relying on a number of older United States Supreme Court decisions. See *id.* While the court characterized the provision of the Tennessee Constitution as stronger, the standards and legal principles adopted under the Tennessee Constitution and the First Amendment are identical. Nothing in decisions following *Pack* suggests that added protections given by Article I, § 3 of the Tennessee Constitution would aid defendants in the circumstances present here. See, e.g., *State ex rel. McLemore v. Clarksville School of Theology*, 636 S.W.2d 706, 711 (Tenn. 1982) (court rejected defendants' First Amendment and § 3 claims based solely on federal constitutional decisions, including *Sherbert v. Verner* and *Wisconsin v. Yoder*).

A similar situation is presented by the Texas decision of *Howell v. State*, a school truancy case where the court found that "[t]he Texas Constitution grants greater religious freedom than is provided for in the United States Constitution." 723 S.W.2d at 758. The court went on, however, to define a free exercise test virtually identical to that set forth in the United States Supreme Court decisions. See *id.* (state must show "a compelling State interest . . . and the lack of a less restrictive, alternative means").

A third state, Oregon, is instructive because the Supreme Court of that state has been a national leader in developing an independent constitutional jurisprudence. In the past, the Oregon Supreme Court interpreted the Oregon guarantees of religious freedom as "identical in meaning" to the United States

Constitution. See *City of Portland v. Thornton*, 174 Or. 508, 512–13, 149 P.2d 972, 974 (1944). More recent cases have, however, involved independent interpretations of Article I, §§ 2 and 3 of the Oregon Constitution, the provisions protecting religious liberty. See *Employment Div. v. Rogue Valley Youth*, 307 Or. 490, 498, 770 P.2d 588, 592–93 (1989); *Cooper v. Eugene School Dist. No. 4J*, 301 Or. 358, 368–73, 723 P.2d 298, 305–08 (1986); *Salem College & Academy, Inc. v. Employment Div.*, 298 Or. 471, 484–92, 695 P.2d 25, 34–39 (1985). In none of these cases did the court hold that the Oregon constitutional provisions afforded greater protections for religious exercise than the First Amendment. In *Smith v. Employment Division*, 301 Or. 209, 216–17, 721 P.2d 445, 448 (1986), the court held that denial of unemployment compensation benefits to a drug counselor who was discharged for using peyote in a Native American religious service did not offend the Oregon Constitution, but did offend the First Amendment.[15]

In summary, we conclude that the decisions of courts in other states with similar constitutional provisions protecting religious freedom support the construction of Chapter I, Article 3 of the Vermont Constitution adopted in our earlier decisions. We cannot find from these decisions that Article 3 affords any greater protections in this case so as to exempt defendants from truancy prosecution when they chose to educate their children by a method that does not meet the minimal Vermont requirements.

---

[15] When this case was initially appealed to the United States Supreme Court, *Employment Division v. Smith*, 485 U.S. 660 (1988), the Court vacated the Oregon Supreme Court's holding with respect to the First Amendment issue and remanded the case back to the Oregon court to determine whether the sacramental use of peyote was proscribed by Oregon's controlled substance law. On remand, the Oregon court concluded that use of peyote in these circumstances was in fact unlawful, but nevertheless held that the First Amendment prevented the law's enforcement. *Smith v. Employment Division*, 307 Or. 68, 76, 763 P.2d 146, 150 (1988). On the second appeal to the United States Supreme Court, the Court reversed the Oregon court, holding that because the use of peyote was prohibited under Oregon law and because that prohibition is constitutional, Oregon may deny the unemployment compensation without offending the First Amendment. *Employment Division v. Smith*, — U.S. at —, 110 S. Ct. at 1605–06.

We will dispose more briefly of the textual and historical arguments. In general, they would require us to overrule *Ferriter v. Tyler* (as defendants acknowledge) and rewrite the historical · analysis in *Swart*. While a case may arise, involving a different conflict between state action and religious liberty, to require such a reevaluation, we remain unconvinced that it is desirable here. Although there are major textual differences between Article 3 and the First Amendment, we find nothing in them that compels a different result in this case. Similarly, defendants' historical analysis shows religious ferment in this state only loosely connected to the issues before the Court. If this ferment had arisen against a national background of insensitivity to religious liberty and a clear failure to separate secular and religious concerns, we could understand better the claim for a different Vermont balancing of the interests before the Court. Instead, defendants' analysis shows that Vermont leaders and citizens have shared the concern for religious liberty on which this nation was founded, and discrete, historical events have tested this concern.

For the above reasons, we conclude that neither the First Amendment to the United States Constitution, nor Chapter I, Article 3 of the Vermont Constitution, require the dismissal of the criminal prosecution against defendants. Accordingly, we must address the other issues.

## III.

 Defendants next challenge the truancy statute as unconstitutionally vague. The statute under which defendants were charged, 16 V.S.A. § 1127(b), provides:

> (b) When, after receiving . . . notice [from the truant officer], a person fails, without legal excuse, to cause a child to attend school as required by this chapter, he shall be fined not more than $1,000.00.

The school attendance requirement is set forth in 16 V.S.A. § 1121, a statute that is set out in full in the opening of this opinion. Defendants argue that the truancy statute is unconstitutionally vague because of the use of the term "without legal excuse."

■ In order to withstand a void-for-vagueness attack, a criminal statute must "define a criminal offense with sufficient certainty so as to inform a person of ordinary intelligence of conduct which is proscribed, and such that arbitrary and discriminatory enforcement is not encouraged." *State v. Cantrell*, 151 Vt. 130, 133, 558 A.2d 639, 641 (1989). See also *State v. Parenteau*, 153 Vt. 123, 125, 569 A.2d 477, 478 (1989) (quoting *Cantrell*); *State v. Harris*, 152 Vt. 507, 509, 568 A.2d 360, 361 (1989) (statute is vague if persons of ordinary intelligence do not know what conduct violates its terms). The prohibition of criminal convictions based on vague statutes is intended to: (1) provide "fair warning" to potential offenders that their conduct is proscribed; and (2) set sufficiently precise standards to avoid arbitrary and discriminatory enforcement. *State v. Purvis*, 146 Vt. 441, 442, 505 A.2d 1205, 1206–07 (1985).

■ We believe that the statute in this case describes the offense with sufficient certainty to withstand the constitutional challenge.[16] Although we have not had an opportunity to construe the truancy statute in its present form, its meaning is clear. We are guided by two canons of statutory construction: (1) we must enforce the plain meaning of the language if possible; and (2) we must construe statutes relating to the same subject matter in pari materia. See *Smith v. Town of St. Johnsbury*, 150 Vt. 351, 355, 554 A.2d 233, 237 (1988); *In re S.B.L.*, 150 Vt. 294, 301, 553 A.2d 1078, 1083 (1988). Reading the truancy statute together with the school attendance statute, 16 V.S.A. § 1121, it is clear that the Legislature intended to specify

---

[16] Because of the nature of defendants' challenge, we need not decide whether defendants may assert the vagueness of the statute in relation to others not before the Court because the statute affects First Amendment rights. See *State v. Cantrell*, 151 Vt. at 135, 558 A.2d at 642–43. The meaning of the "without legal excuse" language affects defendants directly because they assert that the infringement on their religious liberties gives them a lawful excuse for not complying with the school attendance requirements. We note, however, that the mere fact that a criminal statute may affect the exercise of religion cannot allow facial overbreadth analysis, since the possibilities of conflict between sincerely held religious beliefs and criminal statutes are limitless. If this were true, every criminal statute would be subject to overbreadth analysis based on this argument.

the school attendance requirement in the latter statute and place the punishment for noncompliance in the former statute. Thus, the truancy statute defines neither the attendance obligation nor the exceptions to it. The school attendance obligation, "as required by this chapter," is contained in the body of § 1121. The exceptions, each defining a "legal excuse," are set forth in provisions (1) through (4) in § 1121. These elements are not part of the description of the offense but are instead affirmative defenses. See *State v. McCaffrey*, 69 Vt. at 90, 37 A. at 235–36.

We believe that the statutory construction we have arrived at is sufficiently clear to inform persons of reasonable intelligence of what the statute proscribes. In reaching this conclusion, we distinguish as inapplicable cases involving terms like "without legal excuse" where the Legislature has not specifically defined the legal excuses. See *Thornhill v. Alabama*, 310 U.S. 88, 100 (1940) (words "without just cause or legal excuse" in picketing statute "have no ascertainable meaning either inherent or historical"); *State v. Richmond*, 102 Wash. 2d 242, 248, 683 P.2d 1093, 1096 (1984) (nonsupport statute using "without lawful excuse" language is vague because neither the statute nor prior cases were sufficiently specific to establish the meaning). The statute is not void-for-vagueness.

## IV.

Defendants next claim that the criminal prosecution impermissibly intrudes on their substantive due process right to control and direct the education of their child in violation of the Fourteenth Amendment of the United States Constitution. The right defendants assert found its first expression in *Pierce [v. Society of Sisters*, 268 U.S. at 534–35, as the "liberty of parents and guardians to direct the upbringing and education of children under their control" and has been recognized in later decisions of the United States Supreme Court. See *Carey v. Population Services International*, 431 U.S. 678, 685 (1977) (child rearing and education part of the right to privacy); *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (right to educate one's child as one chooses is part of right to privacy). We have also recognized this right in other contexts. See *Paquette v. Pa-*

quette, 146 Vt. 83, 92, 499 A.2d 23, 29 (1985) (due process clause protects "the liberty interest of parents and children to relate to one another in the context of the family, free from governmental interference").

 Although we agree that defendants have the right to direct the education of their children, we do not agree that it is absolute. In *Runyon v. McCrary*, 427 U.S. 160, 178 (1976), the Supreme Court held that the privacy right did not restrict the government "from regulating the implementation of parental decisions concerning a child's education." Thus, it went on to hold that parents "have no constitutional right to provide their children with private school education unfettered by reasonable government regulation." *Id.* Based on the analysis of *Runyon*, all courts that have confronted defendants' argument here have rejected it and held that the parents' rights must give way to reasonable state regulation. See, e.g., *Murphy v. Arkansas*, 852 F.2d at 1044; *Care & Protection of Charles*, 399 Mass. at 336, 504 N.E.2d at 600; *State v. Shaver*, 294 N.W.2d at 899. Since we have held above that the regulation in this case is reasonable, there is no violation of defendants' due process rights as parents.

## V.

Defendants assert three challenges to the information in this case. The first is that the information fails to charge a violation of 16 V.S.A. § 1127 because it alleges that the offense occurred on only two days, April 3 and 4, 1984. Defendants characterize this as a temporary absence from school, which the statute does not prohibit.

The argument that the crime is not committed by a temporary absence is based mainly on *State v. Burroughs*, 102 Vt. 33, 145 A. 260 (1929). *Burroughs* was also a truancy case in which the defendant was charged with neglecting to send his daughter to school on January 19, 1928. At that time, the statute required the parent of a school-age child to "cause such child to attend a public school continuously for the full number of days for which such school is held." *Id.* at 34, 145 A. at 261.

The evidence in *Burroughs* showed that defendant's daughter was late for school almost continuously from January 19th through March 31st and that she was absent from school on certain days before January 18th (the day before that specified in the information). The precise question before the Court was whether the trial court erred in admitting the above evidence. The Court held that the trial court erred for two reasons: (1) the trial court had admitted evidence of crimes not charged—that is, the evidence of the pre-January 19th absences; and (2) tardiness of a child is not truancy. On the latter point, the Court held that the words "continuously for the full number of days for which such school is held" did not cover tardiness "or even a temporary absence not inconsistent with the general design of requiring compulsory attendance of all pupils within the age limits prescribed." *Id.* at 35, 145 A. at 261. Defendants focus on this quoted language and argue that a two-day absence is only temporary and thus not subject to criminal penalties under the truancy law.

The language on which defendants rely is dicta which, if carried to extremes, would emasculate the statute and make the obligation of a parent so uncertain and imprecise that serious constitutional questions would arise. The line between temporary and permanent absence would have to be drawn case by case by court decisions, and parents would be unable to predict clearly where that line would be drawn.

A more narrow and consistent reading of *Burroughs* is that the Court was reacting to the use of the word "continuously" in the then-existing statute which established the school attendance requirement. Thus, the Court held that a parent didn't breach the continuous attendance requirement by sending a child to school late or by allowing the child to be temporarily absent once the child was sent to school.

The current statute no longer uses the word "continuously." As it existed at the time of the events leading to this prosecution, the statute required the parent to cause the child to attend school "for the full number of days for which that school is held." 16 V.S.A. § 1121. As discussed above, the statute contained four exceptions to the attendance requirement. In addi-

tion, 16 V.S.A. § 1123(a) allows the superintendent of a public school to excuse a pupil from attendance for emergencies or absence from the town for a definite time, not to exceed ten consecutive school days.[17] When a child "who is not excused or exempted from school attendance, fails to enter school at the beginning thereof, or being enrolled, fails to attend the same," the teacher or principal must notify the truant officer unless the teacher or principal is satisfied that the pupil is absent because of sickness.[18] 16 V.S.A. § 1126. Once the truant officer is notified, that officer must investigate the cause of the nonattendance and, upon a finding that the child is absent "without cause," notify the person having control of the child of that finding and further notify that person "to cause the child to attend school regularly thereafter." 16 V.S.A. § 1127(a). The criminal penalty applies only to a person who "after receiving such notice" fails without legal excuse to cause the child to attend school as required by chapter 25 of Title 16. See 16 V.S.A. § 1127(b).

██ ██ We must enforce criminal statutes in accordance with their plain meaning where that is clear. See *State v. Saari*, 152 Vt. 510, 519, 568 A.2d 344, 350 (1989). The statute unambiguously authorizes penalties against a parent who fails to cause a child to attend school after receiving notice from the truant officer. The failure to cause a child to attend school, even for one school day, violates the statute. Thus, the information against defendants was sufficient since it charged them with violating the statute on two successive days following receipt of notice from the truant officer.

---

[17] The private school reporting statute, 16 V.S.A. § 165a, does not contain identical language, although it does require the school to state as an objective that it prepares and maintains attendance records for each pupil, 16 V.S.A. § 165a(b)(2)(A); it further requires the school to notify the Commissioner of Education of termination of a child's enrollment, 16 V.S.A. § 165a(e).

[18] The facts of this case do not specify whether the child failed "to enter school at the beginning thereof" or failed to attend once enrolled. In any event, defendants do not challenge the § 1126 notice to the truant officer in this case. See *State v. LaBarge*, 134 Vt. at 278, 357 A.2d at 123 (notice by the truant officer is a prerequisite to the bringing of the proceedings).

We also note that the affidavit that accompanied the information shows that the State was not pursuing an isolated claim of noncompliance. The truant officer gave defendants over a month following the notice to come into compliance, presumably to allow for some negotiation between the State and the Church school. The absence alleged occurred on the two days following the expiration of the notice period and on days when the officer stated by affidavit that he observed the child riding a bicycle on a public street during normal school hours.

## VI.

Next, defendants argue that the information failed to allege all essential elements of the crime and was, therefore, defective. Defendants claim that the information failed to inform them of the cause and nature of the accusations against them in violation of Chapter I, Article 10 of the Vermont Constitution and the Sixth Amendment to the United States Constitution, and further fails to provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged" as required by V.R.Cr.P. 7(b). See generally *State v. Roy*, 151 Vt. 17, 29, 557 A.2d 883, 891–92 (1989).

Our recent cases have used a common sense approach to the constitutional and criminal rule notice obligation. In *State v. Brown*, 153 Vt. 263, 271–73, 571 A.2d 643, 648–49 (1989), defendant alleged that an information charging attempted sexual assault was defective because it failed to specify that the attempt was "interrupted or prevented," as set forth in the applicable statute, and because it failed to state that he had attempted a sexual assault, used compulsion or attempted a sexual act. This Court rejected the claims because the information's conclusory allegations coupled with a specific recitation of the alleged facts in the probable cause affidavit adequately informed defendant of the nature of the charge. *Id.* at 272, 571 A.2d at 648.

Although we have adopted a common sense approach, it is clear that the constitutional provisions and Rule 7(b) require the information to state the essential elements of the offense. See *State v. Kreth*, 150 Vt. 406, 407–08, 553 A.2d 554, 555 (1988).

Thus, the question in this case reduces to whether the information stated the `essential elements of the offense.

The parties briefed and argued the issue generally on whether the information had to negate the four exceptions of 16 V.S.A. § 1121 in order to charge each of the elements of the offense. They have taken different sides on whether the exceptions are part of the definition of the offense or are matters of excuse in light of our early truancy decision in *State v. Mc-Caffrey*, 69 Vt. at 90–91, 37 A. at 235–36, and the more recent truancy decision in *State v. LaBarge*, 134 Vt. at 279–80, 357 A.2d at 124. See also *State v. St. Francis*, 151 Vt. 384, 388–89, 563 A.2d 249, 252 (1989) (reaffirms and explains *McCaffrey* holding). *LaBarge* and *McCaffrey* are burden-of-proof cases, however, and are not determinative of the issue before the Court.

■ As we held in *State v. Brown*, the prosecution does not have to make allegations of everything it will prove. See *State v. Roy*, 151 Vt. at 29, 557 A.2d at 891–92. Normally it is sufficient to allege the statutory elements of the offense without more, as long as the defendants are sufficiently apprised of the charges against them. See *id.*

■ ■ The basic elements of the truancy offense are described in § 1127(b), the criminal statute. While the statute refers generally to obligations imposed elsewhere in chapter 25 of Title 16, it is not necessary that the State detail all those obligations in the information where the defendants have sufficient notice of the charges to form a defense. To determine the sufficiency of the information, it must be read in conjunction with the accompanying affidavit. *State v. Brown*, 153 Vt. at 272, 571 A.2d at 648. Here, the affidavit that accompanied the information supplied all the necessary detail. It specified the obligation to send defendants' child to school and negated all the exceptions in chapter 25. It described the notice given to defendants and observations of defendants' son riding a bicycle on a public street during normal school hours on April 3rd and 4th, the dates of the alleged offense.

None of the exceptions of 16 V.S.A. § 1126 are involved in this case, and only a hypertechnical statement of the State's obligation to plead the elements of the offense could require that they be negated in the information. The information set forth the elements of the offense contained in § 1127(b), and defendants were fully aware of the nature of the accusations against them. The informations are not defective for failure to allege all essential elements of the crime.

## VII.

Finally, defendants allege that the informations are defective because they fail to protect defendants against reprosecution for the same offense. This claim is based on their assertion that parents cannot commit the crime of truancy more than once in a school year since the criminal conduct is the failure to send the child to school "for the full number of days for which a school is held." 16 V.S.A. § 1121. Thus, they argue that the limiting of the offense charged to two days leaves them vulnerable to another charge of truancy during the school year.

The trial court found defendants' double jeopardy attack to be premature and we agree. In *State v. Ross*, 152 Vt. 462, 466, 568 A.2d 335, 338 (1989), the defendant made a similar claim about an information charging him with sexually assaulting a minor because the date was specified only as during the summer of 1983. We held that the double jeopardy claim was premature and could be raised only when a second sexual assault prosecution was commenced. See also *State v. Nash*, 144 Vt. 427, 435, 479 A.2d 757, 761 (1984) (double jeopardy claim, based on failure of State to specify which alternative theory of sexual assault it was using, was premature). The rationale of *Ross* governs here. Defendants can pursue their double jeopardy claim if they are again prosecuted for failing to send their child to school in the same school year.

*For the above reasons, certified questions 1, 2, 3, 5 and 6 are answered in the negative, and certified question 4 is answered in the affirmative. The rulings of the trial court are affirmed, and the matter is remanded for trial.*